1

2

3

4

5          UNITED STATES DISTRICT COURT

6          NORTHERN DISTRICT OF CALIFORNIA

7

8

9    NORMAN YOSHIMOTO,                    Related cases:

10            Plaintiff,                  No. C 10-5438 PJH
                                          No. C 11-3119 PJH
11        v.
                                          **ORDER GRANTING MOTIONS FOR**
12   O'REILLY AUTOMOTIVE, INC., et al.,   **SUMMARY JUDGMENT**

13            Defendants.
     _____/

14

15        Defendant's motions for summary judgment came on for hearing before this court on

16   August 14, 2013.  Plaintiff Norman Yoshimoto ("plaintiff") appeared through his counsel,

17   Sheila Reid.  Defendant CSK Auto, Inc. ("defendant" or "CSK") appeared through its

18   counsel, James Peterson and Jason Ross.  Having read the parties' papers and carefully

19   considered their arguments and the relevant legal authority, and good cause appearing, the

20   court hereby GRANTS defendant's motions for summary judgment.

21                              **BACKGROUND**

22        Plaintiff was a manager for defendant CSK[1] from 1998 through 2010.  Plaintiff

23   alleges that in connection with his employment, he was subjected to unlawful treatment,

24   including demotion and termination, on the basis of his race and national origin (plaintiff is

25   Japanese-American), age (plaintiff was over 40 at the time of all alleged adverse actions),

26   _____

27        [1]Plaintiff originally named as defendants both CSK and its acquiring company, O'Reilly
     Automotive, Inc.  However, after the first summary judgment hearing, the court found that CSK
28   was plaintiff's actual employer, and granted O'Reilly's motion for summary judgment as to it.
     See Yoshimoto I, Dkt. 107.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1   and disability (plaintiff has been diagnosed with a stress-related condition).

2       Defendant CSK operates a chain of auto-parts stores.  Plaintiff was hired by CSK in

3   1998, in the position of regional merchandise manager.  In May 1999, he became a district

4   manager, managing 16 stores and approximately 150 employees.

5       As in many employment cases, the parties have differing accounts of plaintiff's

6   tenure.  In general, plaintiff claims that he was an extremely successful manager who

7   always had high sales numbers and favorable performance reviews.  Defendant, for its

8   part, points to a number of alleged disciplinary problems, especially in plaintiff's interactions

9   with other employees.  Plaintiff, in turn, claims that many of these alleged complaints are

10  actually based on race/age animus.  This order will attempt to organize all of the allegations

11  chronologically.

12      As stated above, plaintiff started working for CSK in 1998, and became a district

13  manager in May 1999.  From the very beginning, plaintiff claims that he was subjected to

14  unfavorable treatment based on his race.  Specifically, he alleges that, at a Christmas party

15  held on December 7, 1998, a member of upper management (Dale Ward) made the

16  announcement that it was "Jap Day - Pearl Harbor Day and here is to your ancestors"

17  (pointing to plaintiff) and then said "Tora Tora Tora."  See Yoshimoto I[2], Dkt. 114 at ¶ 10.

18  From 1999 through 2008, plaintiff claims that he received a phone call every December 7

19  from Ward, who would say "Tora Tora Tora, you dick."  Id.  Plaintiff also claims that another

20  manager (Ro Salazar) would ask, every year, whether plaintiff had received that call from

21  Ward.  Id.

22      During the next few years, plaintiff continued in his position as district manager.

23  Plaintiff emphasizes that he received positive annual evaluations and had high sales

24  numbers during this period, while defendant identifies a number of instances of

25

26

27      [2]Plaintiff has two pending lawsuits, the first of which was filed in state court on February
    9, 2010 and removed to this court on December 1, 2010 (case no. 10-5438, referred to as
    "Yoshimoto I"), and the second of which was filed in this court on June 24, 2011 (case no. 11-
28  3119, referred to as "Yoshimoto II").

United States District Court

For the Northern District of California

1  unprofessional behavior.  For instance, in 2001, plaintiff received a disciplinary letter

2  instructing him to work on "effective communication" and "developing [his] team in a

3  productive environment."  Yoshimoto I, Dkt. 113-11, Ex. 13.  He was told that failure to

4  improve could result in demotion.  Plaintiff responds that this letter does not actually state

5  that it was a disciplinary action, and that "only one issue" had anything to do with his

6  interactions with subordinates.

7        In 2006, plaintiff allegedly solicited funds for a real estate transaction from two

8  subordinates.  One did give plaintiff $10,000, but later complained to CSK of coercion.

9  According to defendant, plaintiff was instructed to return the funds, and was disciplined for

10 the incident via a "corrective action."  See Yoshimoto I, Dkt. 113-11, Ex. 14.  The

11 subordinate then filed suit against CSK for its role in the alleged coercion.  Plaintiff

12 responds by arguing that the subordinate's complaint is hearsay, and that any documents

13 supporting defendant's version of events are not properly the subject of judicial notice.  The

14 other subordinate allegedly resigned "due to plaintiff's pressure to invest."

15       In March 2007, plaintiff received his year-end evaluation for 2006.  The evaluation

16 was delivered by Ronald Stahl, plaintiff's former manager.  Both sides agree that plaintiff's

17 sales performance was praiseworthy.  However, defendant claims that plaintiff was told to

18 work on "his delivery of praise and criticism," "his people skills," and "how he deals with

19 problem associates and how to praise associates when they deserve it."  See Yoshimoto I,

20 Dkt. 113-11, Ex. 15.  Defendant claims that plaintiff was further told to continue working on

21 his "people skills," and was told that he needed to change his management style.  Plaintiff,

22 for his part, notes that his overall performance rating was still "in the upper end of the 'fully

23 successful' range," and emphasizes that "a performance evaluation is not discipline."

24 Plaintiff further points to specific statements in the evaluation that say plaintiff

25 "communicates well with his managers and holds productive meetings" and that he "is a

26 strong team player."  Id.

27       In October 2007, plaintiff was again the subject of a complaint by a subordinate.

28 According to defendant, an employee complained that plaintiff "yelled at him for not

3

1   knowing a sales goal on command, made inappropriate comments and used profanity."

2   See Yoshimoto I, Dkt. 113-11, Ex. 16.  After an investigation, plaintiff reportedly "admitted

3   'becoming frustrated' with the employee."  Defendant issued a "letter of expectation" noting

4   that the conduct was a violation of company policy and "cannot be tolerated," and that

5   further problems could lead to additional disciplinary measures, including termination.  Id.

6   Plaintiff characterizes the complaint as "unsubstantiated," notes that he "denied" the

7   accusation, and emphasizes that a letter of expectation is not a disciplinary action.

8        In March 2008, plaintiff received his year-end evaluation for 2007.  Defendant claims

9   that plaintiff was again instructed to improve his communication with employees, and that

10  he was given a score of 3 (out of 10) under "communication and interpersonal skills."  See

11  Yoshimoto I, Dkt. 113-11, Ex. 17.  Specifically, defendant claims that plaintiff's "delivery is

12  sometimes too harsh and needs to be worked on in 2008."  Id.  Plaintiff again notes that his

13  overall rating was "in the upper end of the 'fully successful' range," and again emphasizes

14  that a performance evaluation is not a disciplinary action.

15       In July 2008, CSK was acquired by O'Reilly.  In plaintiff's view, this acquisition

16  coincided with "a campaign of unwarranted and unsubstantiated corrective actions" that

17  were designed to "create a false record of poor performance."  Plaintiff argues that, before

18  the acquisition, he had received only one "corrective action" during his then-ten-year career

19  with defendants, and had received a raise and a bonus in each year of employment.  See

20  Yoshimoto I, Dkt. 114, ¶ 13.

21       Also in July 2008, plaintiff received a "corrective action" for running what defendant

22  calls an "improper employee contest."  See Yoshimoto I, Dkt. 113-11, Ex. 18.  Specifically,

23  plaintiff set up a sales competition between two groups of sales managers.  The losing

24  team had to buy food and drinks for the winning team, and had to cook for the winners at a

25  barbeque.  Defendant claims that plaintiff made attendance at the event mandatory, even

26  though the attendees were not going to be paid for their time.  Plaintiff argues that

27  attendance was not actually mandatory, and points out that four managers did not attend.

28  Plaintiff further points out that another manager (Stahl) had a similar barbeque two weeks

United States District Court
For the Northern District of California

prior, and "suffered no repercussions." See Yoshimoto I, Dkt. 114, ¶ 14.  Regardless, some employees complained about the event, and the human resources department investigated.  Plaintiff admits that he became "frustrated" at what he perceived as "differential treatment," and "swore during an interview by human resources." Id. Specifically, defendant claims that plaintiff called the complainants "whiners" and told the HR representative that "this is fucking bullshit (or similar words)."  After this, defendant claims that plaintiff held a meeting with the complaining managers, where he told them that he was holding another barbeque, and asked them one-by-one whether they were "in or out."  The managers complained that the meeting was "inappropriate and threatening," and that they feared retaliation for reporting these events. See Yoshimoto I, Dkt. 113-11, Ex. 18.  In response, defendant issued a corrective action, in which plaintiff was told that he had shown "very poor judgment" that "will not be tolerated in the future." Id.  He was told to act professionally toward all employees, reminded that he cannot retaliate against employee complaints, and was warned that failure to correct those problems "will most likely result in termination of employment." Id.

After O'Reilly took over the company, plaintiff claims that he became concerned about "discrimination based on his race and/or national origin, and also on his age." See Yoshimoto I, Dkt. 114, ¶ 24. He claims that, starting in January 2009, he was told twice per month by his manager (Stahl) that he would not receive a salary increase that year because he already "made too much money." Id.  Plaintiff also claims that he was told that the company "can have two of you for the price of one." Id.  At some other, unspecified time in 2009, plaintiff claims that Stahl told plaintiff that he should "should retire soon." Id., ¶ 25.

In March 2009, plaintiff received his year-end evaluation for 2008.  Plaintiff admits that this evaluation was not favorable, though he claims that this was the "first time in his career [that] his overall performance was rated less than successful." See Yoshimoto I, Dkt. 114, ¶ 15. Plaintiff claims that the negative evaluation was a result of defendant's over-emphasis on "management skills" and under-emphasis on sales, and further claims

5

1  that defendant's explanation is pretextual, as only one of the ten performance rating

2  categories actually relates to management skills.

3       Also in March 2009, plaintiff was placed on probation for 90 days.  According to the

4  probation notice, plaintiff "confronted two delivery drivers and informed them they would

5  lose their jobs if sales did not improve" and "instructed them to perform job duties outside of

6  their job description," and that he discussed his investment business with another

7  employee, which was especially "not appropriate" given that he had "been disciplined in the

8  past for receiving monies" from employees to invest in his "personal business."  See

9  Yoshimoto I, Dkt. 113-12, Ex. 22.  The probation notice went on to recount that plaintiff had

10 "received multiple corrective actions related to [his] poor employee relation skills" in the

11 past few years, and specifically mentioned the October 2007 letter of expectation and the

12 July 2008 corrective action.  Id.  The notice included a warning to plaintiff that his

13 "performance will be closely monitored going forward" and that "[i]f significant improvement

14 is not shown during this period of time and maintained at company standards, you will be

15 subject to further disciplinary action including demotion and or termination."  Id.

16      On April 3, 2009, during plaintiff's probationary period, plaintiff received a call from

17 Stahl at 5:00am, asking why he was not at a store inventory that he was scheduled to

18 attend.  See Yoshimoto I, Dkt. 114, ¶ 19.  Plaintiff claims that he "was not aware of any

19 inventory having been scheduled."  Id.  Defendant claims that plaintiff was sent an email

20 with the inventory schedule on March 10, 2009.  Plaintiff claims that he "was experiencing

21 difficulties getting access to the computer system." and claims that his manager knew

22 about these difficulties.  Plaintiff claims that he was "set up" to be terminated with false

23 allegations, and claims that Stahl "ratcheted up his campaign of pressure and criticism" by

24 telling plaintiff "to stop emailing the stores in his district so much," and "stop conducting

25 conference calls."  Id., ¶ 20.  Defendant points out that plaintiff confirmed that the inventory

26 schedule was sent to his correct email address.  See Yoshimoto I, Dkt. 113-11, Ex. 1 at

27 235:2-236:10.

28      As a result of Stahl's alleged treatment, plaintiff was "unable to sleep due to the

United States District Court

For the Northern District of California

1    stress and anxiety" of his probation, and took medical leave, starting on April 6, 2009.  See

2    Yoshimoto I, Dkt. 114, ¶¶ 21, 22.  Plaintiff claims that he continued to receive "harassing"

3    phone calls from defendant Stahl, and that his refusal to answer the phone caused Stahl to

4    "retaliate[]" by withholding plaintiff's paychecks.  Id, ¶ 23.  It does appear that plaintiff

5    ultimately received these checks, but he claims that their withholding caused "severe

6    economic hardship."

7         At this point, plaintiff claims that he "became concerned that the adverse actions

8    instituted against him since O'Reilly took over the company in 2008 and the failure to

9    promote him were motivated by discrimination" based on race, national origin, and/or age.

10   See Yoshimoto I, Dkt. 114, ¶ 24.  Specifically, he notes the 2009 comments about "making

11   too much money" and having "two for the price of one" and about how he should "retire

12   soon."  Plaintiff also claims that Stahl made comments about plaintiff's white hair making

13   him "look old," which caused plaintiff to feel "compelled to color his hair to stop being

14   harassed about his appearance."  In June 2009, plaintiff filed a DFEH charge alleging race

15   discrimination, age discrimination, and retaliation.  See Yoshimoto I, Dkt. 113-12, Ex. 29.

16   Plaintiff admits that the "Tora Tora Tora" comments were not mentioned in the charge.  See

17   Yoshimoto I, Dkt. 113-11, Ex. 1, 224:12-17.

18        Plaintiff returned from medical leave in July 2009.  Between July 2009 and October

19   2009, plaintiff claims that Stahl spoke negatively about another employee who was on

20   medical leave for post-traumatic stress.  See Yoshimoto I, Dkt. 114, ¶ 36.  According to

21   plaintiff, Stahl repeatedly said that "there is no such thing as stress" and that a stress

22   disability is "bullshit."  Id.  When the other employee returned from medical leave, plaintiff

23   claims that Stahl told plaintiff to "take action on him" because "he needs to go away."  Id.

24   Plaintiff interpreted these remarks as "directly critical of plaintiff's own psychological

25   disability" and "intended to harass him in retaliation for having taken stress leave."  Id.

26        On November 2, 2009, defendant called a meeting with plaintiff to review his

27   performance after his probationary period.  Plaintiff was presented with a probation review

28   letter, which stated that plaintiff "continue[d] to use inappropriate methods when managing"

United States District Court

For the Northern District of California

1   subordinates, including threatening to fire or discipline employees without providing specific

2   feedback, reporting late to certain store events, and failing to report to a store inventory.

3   See Yoshimoto I, Dkt. 113-13, Ex. 31.  The letter went on to state that plaintiff was

4   continuing to "perform below the expectations in the areas of communication and

5   leadership," and that he "lost the ability to successfully lead [his] team."  Id.  The letter

6   warned plaintiff that if he was "unable to improve and maintain satisfactory performance,

7   [his] employment will likely be terminated."  Id.  Based on his unsatisfactory performance,

8   plaintiff was "demoted to a Store Manager effective November 2, 2009."  Id.

9        Plaintiff claims that he was urged to resign rather than take the demotion, which

10  plaintiff interpreted as a "clear" message warning him that he was going to be fired.  See

11  Yoshimoto I, Dkt. 114, ¶ 33.  However, because he could not afford to resign, plaintiff

12  accepted the demotion.  Id.

13       The next day (November 3, 2009), plaintiff wrote a seven page rebuttal letter,

14  responding to the complaints against him.  See Yoshimoto I, Dkt. 123, Ex. L.  He explained

15  why the accusations supporting his demotion were false, and expressed his belief that he

16  was being discriminated and retaliated against.  The letter also emphasized his strong

17  sales performance.

18       After the demotion, plaintiff took a second medical leave, starting in November 2009.

19  Plaintiff then filed a supplemental DFEH charge on November 6, 2009, alleging that his

20  demotion was due to discrimination based on age, race, and national origin, and was in

21  retaliation for exercising his FMLA rights.  See Yoshimoto I, Dkt. 113-13, Ex. 32.  In

22  December 2009, plaintiff filed an amended charge with the EEOC.  See Yoshimoto I, Dkt.

23  113-14, Ex. 64.  And on February 9, 2010, plaintiff filed suit in Yoshimoto I.  The complaint,

24  originally filed in state court (then later removed to federal court, based on diversity

25  jurisdiction), asserted nine causes of action: (1) national origin discrimination under the Fair

26  Employment and Housing Act ("FEHA"), (2) racial discrimination under FEHA, (3) age

27  discrimination under FEHA, (4) failure to engage in the interactive process with a disabled

28  employee under FEHA, (5) retaliation under FEHA, (6) harassment under FEHA, (7) failure

8

United States District Court

For the Northern District of California

1    to take reasonable steps to prevent discrimination and harassment under FEHA, (8)

2    intentional infliction of emotional distress under Cal. Civil Code § 43, and (9) defamation of

3    character.  The FEHA "interactive process" claim, the intentional infliction of emotional

4    distress claim, and the defamation claim were dismissed with prejudice in state court,

5    leaving six remaining FEHA claims which are the subject of CSK's motion in <u>Yoshimoto I</u>.

6         The following facts relate only to <u>Yoshimoto II</u>:  Plaintiff returned to work on or about

7    March 1, 2010.  Plaintiff was assigned to a store that already had a manager, and plaintiff

8    claims that he was treated "like an assistant store manager or a store clerk" and "given no

9    responsibility for scheduling or management of the store or employees."  <u>See</u> <u>Yoshimoto II</u>,

10   Dkt. 77, ¶ 39.  Plaintiff also claims that he was "shunned" and "made to feel unwelcome."

11   <u>Id.</u> "

12        Defendant characterizes this time period as one where plaintiff felt he had a "get out

13   of jail free" card, failing to work his assigned shifts on nine occasions.  Defendant issued a

14   "corrective action" in August 2010 based on these missed shifts.  <u>See</u> <u>Yoshimoto II</u>, Dkt.

15   76-13, Ex. 39.  The corrective action noted that "[a]ny further policy violations or job

16   performance problems will lead to further disciplinary action, up to and including demotion

17   or discharge."  <u>Id.</u>  Defendant issued another corrective action in August 2010, based on

18   reports that plaintiff had been "discussing details of [his] lawsuit" during work hours, and

19   that he stated that his attorney told him to "walk out of any location" where Dave

20   VandenBos or Ro Salazar were present.  <u>See</u> <u>Yoshimoto II</u>, Dkt. 76-13, Ex. 40.  This

21   corrective action also stated that "[a]ny further policy violations or job performance

22   problems will lead to further disciplinary action, up to and including demotion or discharge."

23   <u>Id.</u>

24        In October 2010, plaintiff claims that his psychiatrist restricted his work hours to no

25   earlier than 7:00am and no later than 6:00pm, to accommodate his medication schedule.

26   <u>See</u> <u>Yoshimoto II</u>, Dkt. 77, ¶ 40.  Plaintiff claims that he was refused this accommodation,

27   and was instead told that he would have to take a pay cut if he did not maintain his current

28   schedule.  Plaintiff claims that he could not afford the pay cut, and therefore "had no choice

1    but to withdraw his request for accommodation."  Id.

2        In November 2010, plaintiff's employment was terminated.  Defendant's stated

3    reason for the termination was what it calls a verbal "altercation" with a store customer;

4    plaintiff calls it an "unfriendly verbal exchange."

5        According to defendant, the customer approached plaintiff with questions about a

6    tool, asking if he could test it before buying, to make sure that it would allow him to put a

7    BMW emblem on his car.  Employees reported that plaintiff "got angry" and said "I can't

8    believe you own a fuckin' BMW and can't afford to buy the tool."  See Yoshimoto II, Dkt. 76-

9    13, Exs. 41-46.  The customer asked plaintiff for his name, and plaintiff pointed to his shirt

10   and shouted "NORM!"  Id.  The customer threw the tool across the counter, said that he

11   would never shop there again, and left.  As the customer was leaving, plaintiff reportedly

12   yelled "fuck you and your BMW."  Id.

13       Plaintiff's version is as follows: he "attempted every courtesy" with the customer

14   before the customer "escalated the exchange and threw the tool in his direction."  See

15   Yoshimoto II, Dkt. 77, ¶ 41.  Plaintiff claims that this was the first time in his twelve year

16   career with defendants that he was accused of inappropriate behavior towards a customer.

17   Id.  Plaintiff also emphasizes that his manager at the time acknowledged that plaintiff "could

18   have received a lesser discipline, such as a warning or probation."  Id.  Plaintiff claims that

19   the incident was a "pretext to terminate plaintiff based in part on his disability and request

20   for accommodation."  Id., ¶ 42.  In his declaration, plaintiff refers back to the July-October

21   2009 example of Stahl speaking negatively of the employee (Mark S.) who took stress-

22   related disability leave, and cites to another example of an employee who was demoted

23   after she took disability leave.  Id.

24       After his termination, plaintiff filed a supplemental EEOC complaint.  See Yoshimoto

25   II, Dkt. 76-13, Ex. 66.  Plaintiff then filed Yoshimoto II on June 24, 2011, alleging fifteen

26   causes of action.  The court granted summary judgment in favor of defendant on two of

27   them (failure to pay timely compensation under Cal. Labor Code § 203, and a PAGA claim

28   for attorneys' fees), leaving thirteen causes of action remaining:  (1) racial discrimination,

United States District Court

For the Northern District of California

1  harassment, hostile work environment, and retaliation for opposing racial discrimination,

2  harassment, hostile work environment under Title VII, (2) national origin discrimination

3  under FEHA, (3) racial discrimination under FEHA, (4) disability discrimination under FEHA,

4  (5) age discrimination under FEHA, (6) age discrimination under ADEA, (7) retaliation

5  under FEHA, (8) harassment under FEHA, (9) failure to take reasonable steps to prevent

6  discrimination and harassment under FEHA, (10) employment discrimination under

7  California Constitution, article I, ¶ 8, (11) violation of Cal. Labor Code § 98.6 - reprisal for

8  filing a complaint, (12) violation of Cal. Labor Code § 1102.5 - retaliation for disclosing

9  information to a government agency, and (13) termination in violation of public policy.

10  Defendant moves for summary judgment as to all thirteen.

**DISCUSSION**

12  A.    Legal Standard

13       A party may move for summary judgment on a "claim or defense" or "part of . . . a

14  claim or defense." Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is

15  no genuine dispute as to any material fact and the moving party is entitled to judgment as a

16  matter of law. Id.

17       A party seeking summary judgment bears the initial burden of informing the court of

18  the basis for its motion, and of identifying those portions of the pleadings and discovery

19  responses that demonstrate the absence of a genuine issue of material fact. Celotex Corp.

20  v. Catrett, 477 U.S. 317, 323 (1986). Material facts are those that might affect the outcome

21  of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a

22  material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a

23  verdict for the nonmoving party. Id.

24       Where the moving party will have the burden of proof at trial, it must affirmatively

25  demonstrate that no reasonable trier of fact could find other than for the moving party.

26  Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). On an issue where

27  the nonmoving party will bear the burden of proof at trial, the moving party may carry its

28  initial burden of production by submitting admissible "evidence negating an essential

1   element of the nonmoving party's case," or by showing, "after suitable discovery," that the

2   "nonmoving party does not have enough evidence of an essential element of its claim or

3   defense to carry its ultimate burden of persuasion at trial." <u>Nissan Fire & Marine Ins. Co.,</u>

4   <u>Ltd. v. Fritz Cos., Inc.</u>, 210 F.3d 1099, 1105-06 (9th Cir. 2000); <u>see also</u> <u>Celotex</u>, 477 U.S.

5   at 324-25 (moving party can prevail merely by pointing out to the district court that there is

6   an absence of evidence to support the nonmoving party's case).

7       When the moving party has carried its burden, the nonmoving party must respond

8   with specific facts, supported by admissible evidence, showing a genuine issue for trial.

9   Fed. R. Civ. P. 56(c), (e).  But allegedly disputed facts must be material – the existence of

10  only "some alleged factual dispute between the parties will not defeat an otherwise properly

11  supported motion for summary judgment." <u>Anderson</u>, 477 U.S. at 247-48.

12      When deciding a summary judgment motion, a court must view the evidence in the

13  light most favorable to the nonmoving party and draw all justifiable inferences in its favor.

14  <u>Id.</u> at 255; <u>Hunt v. City of Los Angeles</u>, 638 F.3d 703, 709 (9th Cir. 2011).

15  B.    Legal Analysis

16      <u>Yoshimoto I</u>

17      This order shall first address plaintiff's six remaining FEHA claims in <u>Yoshimoto I</u> (as

18  originally numbered in plaintiff's complaint):  (1) national origin discrimination, (2) racial

19  discrimination, (3) age discrimination, (5) retaliation, (6) harassment, and (7) failure to take

20  reasonable steps to prevent discrimination and harassment.

21      The burden-shifting format established in <u>McDonnell-Douglas Corp. v. Green</u>, 411

22  U.S. 792 (1973) is applicable to cases alleging discrimination under FEHA.  <u>See</u> <u>Guz v.</u>

23  <u>Bechtel National, Inc.</u>, 24 Cal.4th 317, 354 (2000) (applying <u>McDonnell Douglas</u> to FEHA

24  claims).

25      Under <u>McDonnell Douglas</u>, a plaintiff must first prove a prima facie case of

26  discrimination by showing that he is a member of a protected class; that he was performing

27  his job duties in a competent and satisfactory manner; that he suffered an adverse

28  employment action; and that similarly situated individuals outside the protected class were

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1  treated more favorably, or other circumstances surrounding the adverse employment action

2  giving rise to an inference of discrimination.  Hawn v. Executive Jet Mgmt., Inc., 615 F.3d

3  1151, 1156 (9th Cir. 2010); Guz, 24 Cal.4th at 355-56.

4      Once a plaintiff establishes a prima facie case of discrimination, the burden shifts to

5  the employer to offer a legitimate, nondiscriminatory reason for the adverse employment

6  decision.  See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142 (2000).

7  An employer's reasons need not rest on true information.  Villiarimo v. Aloha Island Air,

8  Inc., 281 F.3d 1054, 1063 (9th Cir. 2002).  Instead, courts require only that the employer

9  "honestly believed its reasons for its actions, even if its reason is foolish or trivial or even

10  baseless."  Id. (citation and quotation omitted).

11      If the employer meets this burden, the plaintiff must then raise a triable issue of

12  material fact as to whether the defendant's proffered reasons for its actions are a mere

13  pretext for unlawful discrimination.  Hawn, 615 F.3d at 1155.  A plaintiff may do this by

14  producing either direct evidence of discriminatory motive, which need not be substantial, or

15  circumstantial evidence that is "specific and substantial" evidence of pretext.  Godwin v.

16  Hunt Wesson, Inc., 150 F.3d 1217, 1221-22 (9th Cir. 1998).  If the plaintiff succeeds in

17  demonstrating a genuine issue of material fact as to whether the reason advanced by the

18  employer was a pretext for discrimination, then the case proceeds beyond the summary

19  judgment stage.  See Reeves, 530 U.S. at 143.

20      A plaintiff's subjective belief that his termination was unnecessary or unwarranted is

21  not sufficient to create a genuine issue of material fact.  See Cornwell v. Electra Cent.

22  Credit Union, 439 F.3d 1018, 1028 n.6 (9th Cir. 2006).  In addition, "[a] plaintiff cannot

23  defeat summary judgment simply by making out a prima facie case."  Wallis v. J.R. Simplot

24  Co., 26 F.3d 885, 890 (9th Cir. 1994) (quoting Lindahl v. Air France, 930 F.2d 1434, 1437

25  (9th Cir. 1991)).  Rather, the plaintiff must produce "specific, substantial evidence of

26  pretext."  Id. (quoting Steckl v. Motorola, Inc., 703 F.2d 392, 393 (9th Cir.1983)).

27      I.    National origin discrimination under FEHA

28      As set forth above, to establish a prima facie case, plaintiff must show that he (1)

13

United States District Court
For the Northern District of California

1   belongs to a protected class, (2) was performing according to his employer's legitimate

2   expectations, (3) suffered an adverse employment action, and (4) that other employees

3   with qualifications similar to his own were treated more favorably, or that the employer had

4   a discriminatory motive.  See McDonnell Douglas, 411 U.S. at 802; Guz, 24 Cal.4th at 355.

5   Once a plaintiff establishes a prima facie case of discrimination, the burden shifts to the

6   employer to offer a legitimate, nondiscriminatory reason for the adverse employment

7   decision.  See Reeves, 530 U.S. at 142.   If the employer meets this burden, the plaintiff

8   must then raise a triable issue of material fact as to whether the defendant's proffered

9   reasons for its actions are a mere pretext for unlawful discrimination.  Hawn, 615 F.3d at

10  1155.

11       The parties do not appear to dispute that plaintiff, as a Japanese-American, is a

12  member of a protected class, and thus meets element (1) of his prima facie case.

13       As to element (2), CSK argues that plaintiff was not performing his job according to

14  legitimate expectations, as evidenced by the history of interpersonal problems that are

15  documented in plaintiff's evaluations and disciplinary actions.  Specifically, CSK points to

16  (1) an October 2006 "corrective action report" stating that plaintiff was "found to be in

17  violation of company policy by soliciting [his] subordinates for real estate investments" and

18  by "accepting monies from a subordinate after [he] initiated conversations about investing"

19  (Yoshimoto I, Dkt. 113-11, Ex. 14); (2) a March 2007 evaluation noting that plaintiff "needs

20  to work on his delivery of praise and criticism," "needs to work on how he deals with

21  problem associates and how to praise associates when they deserve it," and "needs to

22  work on some of his people skills and store presentation issues" (Yoshimoto I, Dkt. 113-11,

23  Ex. 15); (3) an October 2007 "letter of expectation" regarding a complaint that plaintiff

24  yelled, used profanity, and made inappropriate comments towards a co-worker (Yoshimoto

25  I, Dkt. 113-11, Ex. 16); (4) a March 2008 evaluation noting that plaintiff's "delivery is

26  sometimes too harsh" and that he "needs to make sure he tones things down when he

27  needs to so that he does not offend people" (Yoshimoto I, Dkt. 113-11, Ex. 17); (5) a July

28  2008 "corrective action report" regarding plaintiff's organization of a team barbeque for

United States District Court
For the Northern District of California

1   which employees were not paid for their time, and regarding plaintiff's "inappropriate and

2   threatening" response to complaints about the barbeque, and further informing plaintiff that

3   continued performance problems "will most likely result in the termination of employment"

4   (Yoshimoto I, Dkt. 113-12, Ex. 18); and (6) a March 2009 "corrective action report" noting a

5   number of complaints against plaintiff, including that he "made inappropriate comments to

6   various team members," "confronted two delivery drivers and informed them they would

7   lose their jobs if sales did not improve," "instructed them to perform job duties outside of

8   their job description," and had a conversation with a co-worker about investments that was

9   "not appropriate" (Yoshimoto I, Dkt. 113-12, Ex. 22).  The March 2009 corrective action

10  report went on to note that plaintiff had received "multiple corrective actions related to [his]

11  poor employee relation skills," that he was being placed on probation as a result, and that

12  "if significant improvement is not shown," plaintiff would "be subject to further disciplinary

13  action including demotion and/or termination."  Id.

14        In response, plaintiff argues that "prior to July 2008," he "had never received

15  anything less than a 'commendable' or 'fully successful' rating on his performance

16  evaluations, and had never been placed on probation or a performance improvement plan."

17  Plaintiff further argues that CSK's "asserted justification for the July 2008 corrective action

18  is pretextual," and similarly argues that CSK's "severely adverse step of going from a

19  'corrective action' to 'probation' and threatened termination on this record violated CSK's

20  own progressive discipline policy and is plainly a pretext to paper plaintiff's file to create a

21  false record of poor performance to use to demote and ultimately terminate plaintiff."  In

22  general, plaintiff takes issue with CSK's allegedly sudden emphasis on "management

23  skills," starting in March 2009, while "plaintiff's performance was exemplary in all other

24  categories, particularly the dominant category: sales."

25        Notably, plaintiff does not generally challenge the substance of the complaints

26  against him, but rather argues that CSK "suddenly" began emphasizing management skills

27  on his March 2009 evaluation, as a way to justify the adverse actions taken against him.

28  But plaintiff's argument is belied by the record, which shows that, in October 2006, CSK

United States District Court

For the Northern District of California

1  warned plaintiff that his solicitation of investments from co-workers was "inappropriate and

2  in violation of the Conduct of Associate, Code of Ethics, and Conflict of Interest policies,"

3  and that "further infractions or performance problems may result in further disciplinary

4  actions, up to and including termination." Yoshimoto I, Dkt. 113-11, Ex. 14.  And CSK

5  informed plaintiff of similar performance issues on four additional occasions before it

6  "suddenly" began emphasizing management skills in March 2009. See Yoshimoto I, Dkt.

7  113-11 at Ex. 14 (October 2006 corrective action report regarding solicitation of investment

8  funds from subordinates); Ex. 15 (March 2007 evaluation noting need to improve "people

9  skills"), Ex. 16 (October 2007 letter of expectation regarding inappropriate treatment of a

10  co-worker), Ex. 17 (March 2008 evaluation noting need to improve communication skills),

11  Dkt. 113-12 at Ex. 18 (July 2008 corrective action report regarding improper team barbeque

12  and inappropriate response to complaints about the barbeque).  Plaintiff essentially asks

13  the court to disregard all of his documented performance issues, and instead argues that

14  his strong sales performance, standing alone, establishes that he was performing

15  according to CSK's legitimate expectations.  While the court finds that plaintiff has failed to

16  establish element (2) of a prima facie case of discrimination, it will continue to go through

17  the McDonnell Douglas burden-shifting analysis, so that it may fully address plaintiff's

18  argument that the documented performance issues were pretexts for discrimination.

19          As to element (3), plaintiff identifies a number of allegedly adverse acts: (1) the July

20  2008 disciplinary action in response to plaintiff's organization of an employee contest, (2)

21  the March 2009 negative evaluation based on the same employee contest, (3) the failure to

22  promote plaintiff in February 2009, (4) the placing of plaintiff on probation in February 2009,

23  (5) the demotion of plaintiff in November 2009.  CSK does not appear to dispute that these

24  five acts are sufficiently "adverse" for purposes of establishing a prima facie discrimination

25  claim, instead arguing that plaintiff was not performing his job according to legitimate

26  expectations (discussed above), and that CSK had legitimate, non-discriminatory reasons

27  for each adverse act (discussed below).

28          Plaintiff also makes reference to other allegedly adverse acts, though they are not

United States District Court

For the Northern District of California

1   alleged with the same specificity as the previously-mentioned acts.  In his complaint,

2   plaintiff alleges that his paycheck was withheld while he was on leave, that he was denied

3   an office and a company car, that he was not given a salary increase, and that he was not

4   given formal management training.  See Yoshimoto I, Second Amended Complaint

5   ("SAC"), ¶¶ 17, 25, 36, 50.  CSK appears to argue that it had legitimate, non-discriminatory

6   reasons for each of these acts, though it does challenge the allegation of paycheck-

7   withholding, arguing that "a single delayed paycheck is not an 'adverse act' upon which

8   discrimination can rest."  For purposes of this motion, the court will treat all of these

9   allegations as constituting "adverse acts," although its previous finding that plaintiff was not

10  performing his job according to legitimate expectations applies equally to these adverse

11  actions.

12         As to element (4) of the prima facie case, plaintiff does not argue that similarly-

13  qualified employees were treated more favorably, instead relying on the argument that CSK

14  had a discriminatory motive in taking the above-mentioned adverse actions.  Specifically,

15  plaintiff argues that Ro Salazar, who "participated in and abetted the 'Tora Tora Tora' racial

16  taunts against plaintiff," was a decision-maker involved in the July 2008 discipline, the

17  March 2009 evaluation, the February 2009 failure to promote, and the November 2009

18  demotion.  Plaintiff further argues that the reasons given for the February 2009 probation

19  were the same as those given for the previous adverse actions, and thus seems to argue

20  that the discriminatory animus shown by Salazar and other superiors was at least an

21  indirect motivating factor in the decision to place plaintiff on probation.  Plaintiff does not

22  directly allege a discriminatory motive as to the other alleged adverse acts (i.e., the

23  paycheck withholding, the office and company car, the lack of salary increase, and the lack

24  of training), and instead appears to rely on the "Tora Tora Tora" comments as establishing

25  the required discriminatory motive.  While the court notes that plaintiff has failed to tie the

26  "Tora Tora Tora" comments to any adverse action, the court will accept those comments as

27  evidence of a possible discriminatory motive, at least for purposes of establishing a prima

28  facie discrimination case.

United States District Court
For the Northern District of California

1    As discussed above, while plaintiff has established elements (1) and (3) of a prima

2  facie case of national origin discrimination, and arguably has established element (4), the

3  court finds that he has not established element (2).  But assuming that plaintiff were able to

4  establish that he was performing according to CSK's legitimate expectations at the time of

5  each of the adverse actions, the burden would then shift to the employer-defendant to

6  articulate a "legitimate nondiscriminatory reason" for the adverse employment actions.  In

7  this case, the documented issues with plaintiff's performance do provide such a "legitimate,

8  non-discriminatory reason" for each of the complained-about adverse actions.  Plaintiff was

9  warned, on multiple occasions, of the need to improve his dealings with co-workers and

10  subordinates, but chose to disregard those warnings based on the belief that his strong

11  sales performance would outweigh any other issues.  The court finds that CSK's reasons

12  for taking each of the adverse actions were indeed legitimate and non-discriminatory, thus

13  shifting the burden back onto plaintiff to establish that CSK intentionally discriminated

14  against him.  As stated above, plaintiff may satisfy this burden by proving that the legitimate

15  reasons offered by CSK were factually untrue, thereby creating an inference that those

16  reasons were merely a pretext for discrimination.

17    Notably, plaintiff does not argue that CSK's proffered reasons were "factually

18  untrue."  Plaintiff does not challenge the substance of any of the above-mentioned

19  disciplinary actions, performance evaluations, or other warnings[3].  Instead, plaintiff argues

20  that the very consideration of those issues was pretextual, and motivated by racial

21  discrimination.  Essentially, plaintiff argues that CSK was wrong to consider his

22  management skills along with his sales performance, and wrong to take any adverse

23  actions based on poor management skills.  But plaintiff "cannot simply show that the

24  employer's decision was wrong or mistaken, since the factual dispute at issue is whether

25

26

27    [3]Plaintiff does challenge the veracity of a number of anonymous complaints placed with
the company's "T.I.P.S." hotline, but CSK does not rely on those complaints in this motion, and

28  the court does not rely on those complaints as forming the basis of any "legitimate, non-
discriminatory reason" for the adverse actions.

United States District Court

For the Northern District of California

1   discriminatory animus motivated the employer, not whether the employer is wise, shrewd,

2   prudent, or competent." Hersant v. Dept. of Social Services, 57 Cal.App.4th 997, 1005

3   (1997) (internal citations omitted).  Instead, plaintiff must "demonstrate such weaknesses,

4   implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered

5   legitimate reasons for its action that a reasonable factfinder could rationally find them

6   unworthy of credence, and hence infer that the employer did not act for the [the asserted]

7   non-discriminatory reasons." Id. (internal quotations and citations omitted).  Here, plaintiff

8   does not provide the court with any reason to find CSK's explanations "unworthy of

9   credence," and while the court agrees that the "Tora Tora Tora" comments were clearly

10  inappropriate, plaintiff has not provided any reason to connect those comments to the

11  adverse actions taken against him. Thus, the court finds that plaintiff has failed to show that

12  CSK's stated legitimate, non-discriminatory reasons were pretextual, and thus has failed to

13  raise a triable issue of fact that the adverse actions were based on national origin

14  discrimination.  Also, the court notes that plaintiff's opposition brief makes no argument of

15  pretext as to the alleged withholding of his paycheck, denial of an office and company car,

16  denial of salary increase, and denial of management training, and thus plaintiff has not

17  raised a triable issue of fact as to whether those actions were based on national origin

18  discrimination.  Accordingly, the court GRANTS defendant's motion for summary judgment

19  on plaintiff's claim for national origin discrimination in Yoshimoto I.

20      II.    Racial discrimination under FEHA

21          This claim is substantively the same as the previous claim, and the court applies the

22  same reasoning and GRANTS defendant's motion for summary judgment on plaintiff's

23  claim for racial discrimination in Yoshimoto I.

24      III.   Age discrimination under FEHA

25          FEHA prohibits employment discrimination on the basis of age.  See Cal. Gov't

26  Code. § 12940(a).  Courts generally employ the McDonnell Douglas burden-shifting

27  analysis in age discrimination cases.  Accordingly, in the usual case, a prima facie case of

28  age discrimination arises when the employee shows: (1) at the time of an alleged adverse

**United States District Court**
For the Northern District of California

1    employment action, the employee was 40 years of age or older; (2) an adverse action was

2    taken against the employee; (3) at the time of the adverse action the employee was

3    satisfactorily performing his job; and (4) some other circumstance suggesting a

4    discriminatory motive was present. See Guz, 24 Cal.4th at 355.   Notably, the fact that

5    plaintiff's evidence constitutes a prima facie case will not always support a finding of

6    discrimination or avoid summary judgment.  The probative value of plaintiff's evidence must

7    be strong enough to overcome any innocent reasons given by the employer for the action

8    taken.  See, e.g., Guz at 362.

9         Plaintiff was over 40 years old at the time of all alleged adverse actions, which are

10   the same adverse actions described above in the context of plaintiff's national origin

11   discrimination claim.  Those adverse actions also meet element (2) of the prima facie case.

12        Element (3) requires plaintiff to show that he was "satisfactorily performing" his job at

13   the time of the adverse actions.  The court finds this element to be substantively the same

14   as element (2) of plaintiff's national origin discrimination claim, which requires plaintiff to

15   show that he "was performing according to his employer's legitimate expectations."  Thus,

16   the court incorporates its previous analysis here, and finds that CSK has shown that

17   plaintiff was not satisfactorily performing his job at the time of the adverse actions.  As

18   discussed above, plaintiff was first warned of inappropriate behavior in October 2006, and

19   more warnings and disciplinary action continued through 2009.  Accordingly, the court finds

20   that plaintiff cannot meet element (3) of a prima facie age discrimination case, but as it did

21   above, the court will continue to analyze plaintiff's claim under the McDonnell Douglas

22   burden-shifting framework.

23        Element (4) requires plaintiff to show some circumstance suggesting discrimination

24   was present.  For this element, plaintiff points to a number of comments made by his

25   supervisor, Ronald Stahl.  Specifically, plaintiff alleges that Stahl told him that his white hair

26   made him "look old" and that he should "get some Grecian" (referring to a product that

27   restores color to greying hair), that "he should retire," and that plaintiff "made too much

28   money" to get a raise and that Stahl could "have two of you [referring to plaintiff] for the

United States District Court

For the Northern District of California

1    price of one."   See Yoshimoto I, Dkt. 114, ¶ 24.  Additionally, plaintiff alleges that CSK's

2    former CEO (Maynard Jenkins) repeated the "get some Grecian" comment and called

3    plaintiff an "old man," and that plaintiff's former supervisor Ro Salazar commented on his

4    grey hair.  Id., ¶ 25.  The court finds that at least some of these comments are sufficient to

5    establish element (4) of a prima facie age discrimination claim.

6         If plaintiff were able to meet all four elements of a prima facie age discrimination

7    case, the burden would then shift to CSK to provide a legitimate, non-discriminatory reason

8    for any adverse action.  And as discussed above, in the context of plaintiff's national origin

9    discrimination claim, CSK has provided evidence of plaintiff's continued performance

10   issues, the substance of which is not challenged by plaintiff.  This showing then shifts the

11   burden back to plaintiff to show that the proffered reason was actually a pretext for age-

12   based discrimination.

13        As evidence of pretext, plaintiff points to the same comments that he cited as

14   evidence of a discriminatory motive.  Specifically, plaintiff points to comments made by

15   Stahl that plaintiff  would not receive a salary increase because he already "made too much

16   money," and that the company "can have two of you for the price of one."  These

17   comments relate to salary, and while salary may have been correlated with plaintiff's age

18   (or, more specifically, his length of tenure with the company), any comments about salary

19   are distinct from those comments that directly related to plaintiff's age.  See Hazen Paper

20   Co. v. Biggins, 507 U.S. 604, 611-12 (1993) (finding no age discrimination where

21   employer's decision was based on factor that was merely "correlated with age").

22        As to the other comments cited by plaintiff as evidence of discriminatory motive –

23   that he "should retire soon," that he "looked old" because of his white hair, and that he

24   should "get some Grecian" – the court agrees that these comments are directly related to

25   plaintiff's age.  However, while these comments might suffice as "some other circumstance

26   suggest[ing] discriminatory motive" (for purposes of establishing a prima facie case under

27   Guz), plaintiff has not presented "evidence tying the alleged discriminatory comments to

28   any adverse action."  See Cozzi v. County of Marin, 787 F.Supp.2d 1047, 1060 (N.D. Cal.

21

United States District Court

For the Northern District of California

1  2011) (citing Nidds v. Schindler Elevator Corp., 113 F.3d 912, 919 (9th Cir. 1996)).  In

2  Nidds, the Ninth Circuit considered a comment from the plaintiff's supervisor that he

3  intended to get rid of all of the "old timers" to be "weak evidence and not enough to create

4  an inference of age discrimination."  Nidds, 113 F.3d at 919 (upholding grant of summary

5  judgment in favor of employer).  Critically, the Nidds court found that "the comment was not

6  tied directly to Nidds' layoff."  Id.  Similarly, in Nesbit v. Pepsico, Inc., the Ninth Circuit found

7  that a supervisor's comment that "we don't necessarily like grey hair" was "uttered in an

8  ambivalent manner and was not tied directly to Nesbit's termination."  994 F.2d 703, 705

9  (9th Cir. 1993) (upholding grant of summary judgment in favor of employer).  The court

10 finds that Nidds and Nesbit directly control here, because plaintiff has similarly failed to

11 show any connection between the age-related comments and the adverse acts.  The 2007

12 "get some Grecian" comment was far removed in time from any of the adverse actions, and

13 the 2009 comment that plaintiff "should retire soon" was made after plaintiff had already

14 received multiple warnings regarding his performance.  See Yoshimoto I, Dkt. 113-11 at Ex.

15 14 (October 2006 corrective action report regarding solicitation of investment funds from

16 subordinates); Ex. 15 (March 2007 evaluation noting need to improve "people skills"), Ex.

17 16 (October 2007 letter of expectation regarding inappropriate treatment of a co-worker),

18 Ex. 17 (March 2008 evaluation noting need to improve communication skills), Dkt. 113-12

19 at Ex. 18 (July 2008 corrective action report regarding improper team barbeque and

20 inappropriate response to complaints about the barbeque).  Thus, the court finds that

21 plaintiff has not presented evidence sufficient to raise a triable issue as to whether the

22 adverse actions were motivated by age discrimination, and GRANTS defendant's motion

23 for summary judgment on plaintiff's FEHA age discrimination claim.

24         IV.    Retaliation under FEHA

25         In order to make out a prima facie case of retaliation, a plaintiff must establish that

26 (1) he acted to protect his FEHA rights, (2) that an adverse employment action was

27 thereafter taken against him, and (3) that a causal link exists between those two events.

28 See Steiner v. Showboat Operating Co., 25 F.3d 1459, 1465 (9th Cir. 1994).

1    Plaintiff filed a DFEH charge on June 11, 2009, which does satisfy element (1) of a

2  prima facie retaliation claim.  That administrative charge alleged that plaintiff had been

3  subjected to "aggressive behavior" based on his age, race, and for "speaking up" about

4  "unfounded complaints."  See Yoshimoto I, Dkt. 113-12 at Ex. 29.

5    Plaintiff returned to work on July 1, 2009, and was demoted in November 2009.

6  That demotion does meet element (2) of a prima facie retaliation case.  This is the only

7  adverse action relevant to plaintiff's retaliation claim, as all other adverse actions (i.e., the

8  July 2008 disciplinary action, the February 2009 failure to promote, the March 2009

9  probation, and the March 2009 negative evaluation) occurred before he engaged in the

10 protected activity.

11    Thus, the key issue relevant to plaintiff's retaliation claim is whether his demotion is

12 causally linked to his filing of administrative charges[4].  The court finds that plaintiff has

13 failed to show such a link, and that CSK is entitled to summary judgment as a result.

14 Plaintiff presents no evidence that the demotion was motivated by his protected activity,

15 and instead relies on the timing of his demotion.  However, the demotion did not occur until

16 five months after plaintiff filed his administrative charges.  While "causation can be inferred

17 from timing alone," such an inference can only be made if the adverse action occurred "on

18 the heels" of protected activity.  Villiarimo, 281 F.3d at 1065.  Given the number of

19 performance-related warnings that were given before the protected activity, plaintiff cannot

20 raise a triable issue that his "engaging in the protected activity was one of the reasons for

21 his [demotion] and that but for such activity he would not have been fired."  Id. (quoting

22 Ruggles v. California Polytechnic State Univ., 797 F.2d 782, 785 (9th Cir. 1986)).  As

23 _____

24    [4]The court notes that plaintiff's charge was filed while he was on stress-related medical
   leave, and while the complaint does not allege that the taking of leave was also protected
25 activity, plaintiff's opposition brief contains a vague reference to other employees being subject
   to adverse employment actions "after they exercised their right to take medical leave."
26 Yoshimoto I, Dkt. 125 at 25.  However, even if plaintiff intends to claim retaliation based on his
   taking medical leave, plaintiff still cannot establish the required causal link, especially since the
27 taking of leave was even further removed in time from the demotion than was the filing of
   administrative charges (specifically, the demotion occurred five months after the administrative
28 charges were filed, and seven months after plaintiff took leave).

United States District Court

For the Northern District of California

1   discussed above, plaintiff was first warned in 2001 that failure to improve his performance

2   could result in demotion, and was again warned in October 2006, July 2008, and March

3   2009.  Accordingly, the court finds that plaintiff is unable to establish a prima facie case of

4   retaliation under FEHA, and GRANTS summary judgment in favor of defendants on this

5   claim in <u>Yoshimoto I</u>.

6         V.      Harassment under FEHA

7         To prevail on a hostile workplace/harassment claim under FEHA, an employee must

8   show that he was subjected to verbal or physical conduct related to a protected trait, that

9   the conduct was unwelcome, and that the conduct was sufficiently severe or pervasive to

10  alter the conditions of his employment and create an abusive work environment.  <u>Reno v.</u>

11  <u>Baird</u>, 18 Cal.4th 640, 646-47 (1998).

12        The employee must exhaust the administrative remedy provided by the statute by

13  filing a complaint with the DFEH and must obtain a notice of right to sue in order to be

14  entitled to file a civil action in court based on FEHA violations.  <u>Romano v. Rockwell Int'l,</u>

15  <u>Inc.</u>, 14 Cal.4th 479, 492 (1996).  The timely filing of an administrative complaint is a

16  prerequisite to bringing a civil action for damages under FEHA.  <u>Id.</u>  Regarding the

17  applicable limitation period, FEHA provides that no complaint for any violation of its

18  provisions may be filed with DFEH "after the expiration of one year from the date upon

19  which the alleged unlawful practice or refusal to cooperate occurred."  <u>Id.</u> (citing Cal. Gov't.

20  Code  § 12960).

21        However, under the continuing violation doctrine, California courts have recognized

22  that employers will be "liable for actions that take place outside the limitations period if

23  these actions are sufficiently linked to unlawful conduct that occurred within the limitations

24  period."  <u>Yanowitz v. L'Oreal USA, Inc.</u>, 36 Cal.4th 1028, 1056 (2005) (citing <u>Richards v.</u>

25  <u>CH2M Hill, Inc.</u>, 26 Cal.4th 798, 812 (2001)).

26        Here, plaintiff alleges that he was subjected to harassment and a hostile work

27  environment based on his age, race, national origin, and disability.  The court will address

28  each category in turn.

United States District Court

For the Northern District of California

1    First, plaintiff alleges that he was subjected to age-based harassment sufficient to

2    create a hostile work environment.  As evidence, he points to Stahl's comments that

3    plaintiff's white hair made him "look old," that "he should retire," and that plaintiff "made too

4    much money" to get a raise and that Stahl could "have two of you [referring to plaintiff] for

5    the price of one."  Plaintiff argues that these comments, "coupled with defendant's

6    systematic termination of older workers or forcing their resignation," is sufficient to create

7    triable issues of fact as to "whether the age based comments and atmosphere at CSK were

8    sufficiently severe or pervasive to constitute a hostile work environment."

9    As an initial matter, the court places little weight on plaintiff's allegations regarding

10   the demotion, firing, or forced termination of his co-workers, because plaintiff was not

11   actually aware of any such events while he was employed with CSK.  Plaintiff's declaration

12   states that, as of November 3, 2009, he "believed that other employees in the company

13   may" have been "pushed out the door because of their age," but he admits that he only

14   became aware of his co-workers' treatment "since [his] subsequent termination."

15   Yoshimoto I, Dkt. 114, ¶ 34.  Thus, during the time that plaintiff was actually employed, he

16   merely had suspicions of how other employees were being treated, which do not constitute

17   "verbal or physical conduct," and are not sufficient to "alter the conditions of his

18   employment and create an abusive work environment."

19   With regard to the age-related comments, the court agrees that (1) plaintiff was

20   subjected to verbal conduct related to his age, and (2) the conduct was unwelcome, but the

21   court disagrees that a handful of isolated comments spread over more than two years can

22   be sufficiently severe or pervasive to alter the conditions of his employment.  See Manatt v.

23   Bank of America, NA, 339 F.3d 792, 799 (9th Cir. 2003) (collecting cases).

24   Next, plaintiff alleges that he was subjected to race and national origin-based

25   harassment sufficient to create a hostile work environment.  As evidence, he relies on the

26   "Tora Tora Tora" comments mentioned above, in the context of plaintiff's race and national

27   origin discrimination claims.  These comments occurred once a year, on December 7, from

28   1998 to 2008.  Critically, while the last of these comments did occur less than one year

25

1   before plaintiff filed his DFEH charge (on June 11, 2009), plaintiff did not mention the "Tora

2   Tora Tora" comments at all in his DFEH charge.  If he had, the continuing violations

3   doctrine would have swept in all of the "Tora Tora Tora" comments dating back to 1998.

4   And while plaintiff's administrative charge did include a vague statement that he was being

5   "targeted" based on his "age," "race," and "in retaliation" for speaking up about complaints,

6   no specific race-related conduct is mentioned.  However, even though the court finds that

7   plaintiff has not exhausted his administrative remedies with regard to the "Tora Tora Tora"

8   comments, it will nonetheless address plaintiff's race-based harassment claim on the

9   merits.

10        On the merits, the court finds plaintiff's argument to be very similar to the argument

11  advanced by the plaintiff in Manatt v. Bank of America.  In Manatt, the plaintiff (a Chinese-

12  American) overheard a number of conversations using the phrase "China man" and

13  referring to "communists" and "rickshaws."  The plaintiff was directly mocked by her co-

14  workers, who "pulled their eyes back with their fingers in an attempt to imitate or mock the

15  appearance of Asians."  Most egregiously, the Manatt plaintiff was told that her

16  pronunciation of the word "Lima" was "ridiculous," was asked to repeat the pronunciation for

17  others to hear, and had her co-workers explain her pronunciation by saying "that's because

18  she's a China woman."  339 F.3d at 795-96.  The Manatt court acknowledged that it was

19  "troubled" by the comments and by the "racially offensive" pulling back of the eyes, and

20  emphasized that "[i]f these actions had occurred repeatedly, Manatt may very well have

21  had an actionable hostile environment claim."  Id. at 799.  However, the court found that the

22  "regrettable incidents . . . did not alter the conditions of Manatt's employment," and granted

23  summary judgment for the employer.  Id.

24        The court finds that Manatt controls here, as the comments in this case were less

25  severe and more spread out than the comments and conduct in Manatt.  In this case,

26  plaintiff was subject to a single comment once a year, all but one of which was delivered

27  over the phone.  While the "Tora Tora Tora" comments were doubtlessly offensive, and like

28  Manatt, may have created a hostile work environment if they had occurred with more

United States District Court
For the Northern District of California

1  frequency, they were not sufficiently severe or pervasive to alter the conditions of

2  employment.

3      Finally, plaintiff alleges that he was subjected to disability-based harassment

4  sufficient to create a hostile work environment.  As evidence, he points to repeated

5  comments by Stahl that "there is no such thing as stress and what the hell is PTSD," made

6  between July and October 2009.  Plaintiff also points to additional comments made by

7  Stahl in October 2009 regarding another co-worker who was on stress disability leave

8  (Mark S.), who Stahl said "needs to go away" because his stress disability was "bullshit."

9  On another occasion, sometime after plaintiff's demotion, Stahl learned that plaintiff was

10  absent from work due to a doctor's appointment, and Stahl replied "bullshit."

11      As a threshold matter, CSK argues that plaintiff failed to exhaust his administrative

12  remedies with regard to his claim of disability-based harassment.  CSK notes that plaintiff's

13  June 2009 charge did not include a checkmark in the box for "disability"-based

14  discrimination, and the narrative section does not mention any disability-based harassment

15  or discrimination (even though the charge does mention plaintiff's medical leave).  See

16  Yoshimoto I, Dkt. 113-12, Ex. 29.  Nor does plaintiff's supplemental charge, filed on

17  December 30, 2009, mention any disability-based harassment or discrimination.  See

18  Yoshimoto I, Dkt. 113-13, Ex. 32.  Plaintiff did check the "disability" box on his December

19  2009 charge, but the narrative alleges that plaintiff was "being targeted because of [his]

20  age, [his] race, and in retaliation because [he] filed complaints of discrimination with the

21  EEOC and DFEH."  Id.  Plaintiff filed another DFEH charge on December 22, 2010, but

22  CSK argues that the December 2010 charge was filed more than one year after any

23  alleged disability-based harassment, thus making it untimely as to the above comments

24  made by Stahl.

25      The court agrees with CSK that plaintiff failed to exhaust his disability-based

26  harassment claim.  Plaintiff identifies comments that were made to him before October

27  2009, which would have given him until October 2010 to exhaust his remedies as to those

28  comments.  While one comment did occur sometime after plaintiff's demotion in November

27

United States District Court

For the Northern District of California

1    2009, that comment was not made to plaintiff, instead, it was made to another employee

2    about plaintiff, and thus cannot form the basis of a harassment claim.  However, despite

3    plaintiff's failure to exhaust, the court will address plaintiff's disability-based harassment

4    claim on the merits.

5           On the merits, the court finds that the alleged disability-related comments are less

6    severe than the race-related comments mentioned above, and thus, Manatt applies with

7    even more force here.  Plaintiff identifies three comments (one of which may have been

8    repeated, though plaintiff does not provide details regarding how often it was repeated) that

9    were made about the disability of plaintiff's co-worker, Mark S.  The California Supreme

10   Court has found that such second-hand comments are "considered less offensive and

11   severe than conduct that is directed at the plaintiff."  Lyle v. Warner Bros. Television

12   Productions, 38 Cal.4th 264, 285 (2006).  Moreover, even if the comments had been

13   directed at plaintiff, they are not sufficiently severe as to alter the conditions of employment.

14          For these reasons, the court GRANTS defendant's motion for summary judgment on

15   plaintiff's harassment claim in Yoshimoto I.

16          VI.     Failure to prevent discrimination/harassment under FEHA

17          CSK argues that this claim rises or falls with plaintiff's other causes of action, and

18   plaintiff responds by arguing that his "evidence demonstrates that senior management

19   participated in and aided and encouraged the racially offensive taunts against plaintiff and

20   that no one took any steps to prevent it in response to plaintiff's objections."  While

21   plaintiff's response appears to tie this claim to plaintiff's race-based allegations, his

22   complaint also mentions age-based discrimination/harassment and the "failure to

23   accommodate his need for accommodation" (presumably referring to disability-based

24   accommodations).  Thus, the court construes this claim as being premised on all asserted

25   types of discrimination and harassment.  However, the court agrees with CSK that, in the

26   absence of any viable claims for discrimination or harassment, this failure to prevent claim

27   must also fail.  See Leland v. City and County of San Francisco, 576 F.Supp.2d 1079,

28   1103 (N.D. Cal. 2008) (a 'failure to prevent' claim requires a showing that "plaintiff was

United States District Court

For the Northern District of California

1   subjected to discrimination, harassment or retaliation").  Accordingly, the court GRANTS

2   defendant's motion for summary judgment on plaintiff's failure to prevent

3   discrimination/harassment in Yoshimoto I.

4        Thus, defendant's motion for summary judgment is GRANTED as to all remaining

5   claims in Yoshimoto I.

6        Yoshimoto II

7        The court will now address the thirteen claims asserted in Yoshimoto II: (1) racial

8   discrimination, harassment, hostile work environment, and retaliation for opposing racial

9   discrimination, harassment, and hostile work environment under Title VII, (2) national origin

10  discrimination under FEHA, (3) racial discrimination under FEHA, (4) disability

11  discrimination under FEHA, (5) age discrimination under FEHA, (6) age discrimination

12  under ADEA, (7) retaliation under FEHA, (8) harassment under FEHA, (9) failure to take

13  reasonable steps to prevent discrimination and harassment under FEHA, (10) employment

14  discrimination under the California Constitution, Article I, § 8, (11) violation of Cal. Labor

15  Code § 98.6, (12) violation of Cal. Labor Code § 1102.5, and (13) wrongful termination in

16  violation of public policy.  The court will address each of these claims in turn.

17       I.    Racial discrimination, harassment, hostile work environment, and retaliation

18             for opposing racial discrimination, harassment, and hostile work environment

19             under Title VII

20       Plaintiff sweeps a host of allegations into this claim, which the court treats as three

21  distinct claims: (1) racial discrimination, (2) race-based harassment/hostile work

22  environment, (3) retaliation.

23       First, plaintiff's Title VII discrimination claim is governed by the same McDonnell

24  Douglas burden-shifting test that governed his FEHA discrimination claim.  See Surrell v.

25  California Water Serv. Co., 518 F.3d 1097, 1103 (9th Cir. 2008) (applying McDonnell

26  Douglas to Title VII claims).  As stated above, under McDonnell Douglas, a plaintiff must

27  first prove a prima facie case of discrimination by showing that (1) he is a member of a

28  protected class; that (2) he was performing his job duties in a competent and satisfactory

29

United States District Court

For the Northern District of California

1    manner; that (3) he suffered an adverse employment action; and (4) that similarly situated

2    individuals outside the protected class were treated more favorably, or other circumstances

3    surrounding the adverse employment action giving rise to an inference of discrimination.

4    Hawn, 615 F.3d at 1156; Guz, 24 Cal. 4th at 355-56.

5         Once a plaintiff establishes a prima facie case of discrimination, the burden shifts to

6    the employer to offer a legitimate, nondiscriminatory reason for the adverse employment

7    decision.  See Reeves, 530 U.S. at 142.   If the employer meets this burden, the plaintiff

8    must then raise a triable issue of material fact as to whether the defendant's proffered

9    reasons for its actions are a mere pretext for unlawful discrimination.  Hawn, 615 F.3d at

10   1155.   A plaintiff may do this by producing either direct evidence of discriminatory motive,

11   which need not be substantial, or circumstantial evidence that is "specific and substantial"

12   evidence of pretext.  Godwin, 150 F.3d at 1221-22.  If the plaintiff succeeds in

13   demonstrating a genuine issue of material fact as to whether the reason advanced by the

14   employer was a pretext for discrimination, then the case proceeds beyond the summary

15   judgment stage.  See Reeves, 530 U.S. at 143.

16        As discussed above in the context of Yoshimoto I's FEHA discrimination claim,

17   plaintiff has established that he is a member of a protected class.  Before looking at

18   element (2), whether plaintiff was performing his job in a satisfactory manner, the court first

19   identifies the adverse actions at issue in Yoshimoto II.  First, plaintiff identifies an August

20   2010 disciplinary action – which appears to consist of two disciplinary actions issued on the

21   same day, August 27, 2010.  Plaintiff received a "corrective action" for missing a number of

22   assigned shifts in violation of CSK's attendance policy, and a separate "corrective action"

23   for discussing his lawsuit at work and for walking out of any location where HR Manager

24   Dave VandenBos or Divisional VP Ro Salazar was present.  See Yoshimoto II, Dkt. 76-13,

25   Exs. 39, 40.  The second adverse action identified by plaintiff is the termination of his

26   employment on November 18, 2010.

27        Having identified the two adverse actions at issue in Yoshimoto II, the court must

28   then determine whether plaintiff can establish element (2) of a prima facie case of

1    discrimination by showing that he was performing his job satisfactorily at the time of each

2    action.  CSK presents evidence that plaintiff was not performing his job satisfactorily, either

3    in August 2010 or in November 2010.  Regarding August 2010, CSK first points to the

4    history of performance problems identified in Yoshimoto I, which culminated in plaintiff's

5    demotion in November 2009.  CSK then argues that plaintiff missed a total of nine assigned

6    shifts in June and July 2010, which triggered the corrective action and which show that

7    plaintiff was not performing his job satisfactorily.  CSK further argues that plaintiff was

8    discussing his lawsuit (Yoshimoto I) at work, and telling staff that he intended to walk out of

9    any location where VandenBos or Salazar was present, which triggered the second

10   corrective action, and which further shows that plaintiff was not performing his job

11   satisfactorily.  Plaintiff disputes both of these accounts – first arguing that, as manager, he

12   had authority to change the schedule, and thus was merely exercising that authority when

13   he allegedly "missed" shifts.  As to the second corrective action, plaintiff argues that he was

14   not actually on the clock when he was discussing his lawsuit.  The court notes that plaintiff

15   appears to have raised these explanations when he was presented with the corrective

16   actions.  See Dkt. 113-13, Exs. 39, 40.  However, the court also notes that an employer's

17   reasons need not rest on true information.  Villiarimo, 281 F.3d at 1063.  Instead, courts

18   require only that the employer "honestly believed its reasons for its actions, even if its

19   reason is foolish or trivial or even baseless."  Id. (citation and quotation omitted).

20   While the court finds that plaintiff has failed to establish element (2) of a prima facie case of

21   discrimination, it will assume, for the sake of argument, that plaintiff was performing his job

22   satisfactorily at the time of the August 2010 disciplinary actions, so plaintiff's arguments of

23   pretext may be fully addressed.

24        However, plaintiff cannot establish that he was performing his job satisfactorily at the

25   time of his November 2010 termination.  As discussed in the "background" section of this

26   order, plaintiff's termination was precipitated by a confrontation (CSK calls it an

27   "altercation," while plaintiff calls it an "unfriendly verbal exchange") with a customer on

28   November 6, 2010.  To summarize, a customer asked plaintiff if he could test a tool before

United States District Court

For the Northern District of California

1   buying it, to make sure that it would allow him to put a BMW emblem on his car.  According

2   to CSK, employees reported that plaintiff "got angry" and said "I can't believe you own a

3   fuckin' BMW and can't afford to buy the tool."  The customer asked plaintiff for his name,

4   and plaintiff pointed to his shirt and shouted "NORM!"  The customer threw the tool across

5   the counter, said that he would never shop there again, and left.  As the customer was

6   leaving, plaintiff reportedly yelled "fuck you and your BMW."  According to plaintiff, after he

7   was asked about testing the tool, the customer "escalated the exchange and threw the tool

8   in his direction."  Plaintiff does not dispute CSK's characterization of his actions, but does

9   argue that the customer provoked the exchange.  However, CSK presents a statement

10  from an employee who witnessed the exchange, who made certain to "clarify that Norm

11  was the first person to use inappropriate words," and that he "did not hear the customer get

12  hostile until after Norm got hostile towards the customer."  Yoshimoto II, Dkt. 76-13, Ex. 42.

13  Plaintiff argues that this was the first time in his twelve year career that he was accused of

14  inappropriate behavior towards a customer, and further argues that his manager at the time

15  (Randy Brunell) "testified that plaintiff could have received a lesser discipline for the

16  incident, such as a warning or probation."

17      While plaintiff may be correct that a "lesser discipline" might have been sufficient, the

18  court finds that the November 2010 customer incident shows that plaintiff was not

19  performing his job satisfactorily, thus preventing plaintiff from establishing a prima facie

20  case of discrimination with regard to his termination.  Simply put, yelling expletives at a

21  customer is completely inconsistent with a satisfactory job performance.  While the court

22  will address the McDonnell Douglas burden-shifting analysis with respect to the

23  termination, it does so only to address plaintiff's argument that his termination was

24  pretextual.

25      The court has already addressed element (3), which is met by the August 2010

26  disciplinary actions as well as the November 2010 termination.

27      For element (4), plaintiff does not actually present any evidence regarding similarly-

28  situated individuals being treated favorably, but he does point out that "upper management

United States District Court

For the Northern District of California

at CSK is predominantly Caucasian and Hispanic," and that "there were no Asians in district manager positions at the company other than plaintiff."  This alone does not meet element (4), because plaintiff presents no evidence that those non-Asians were similarly-situated with regard to the alleged behavior underlying each of the relevant adverse actions.  In other words, to meet his element, plaintiff would need to show evidence that non-Asians who were alleged to have violated company rules were not issued "corrective actions" or that non-Asians who were alleged to have acted unprofessionally with a customer were not terminated.  However, plaintiff does present evidence of "other circumstances surrounding the adverse employment action giv[ing] rise to an inference of discrimination," namely, the "Tora Tora Tora" comments.  Thus, the court finds that plaintiff has met element (4) of a prima facie discrimination case.

Assuming that plaintiff has established a prima facie case of discrimination, the burden would then shift to CSK to identify a legitimate, non-discriminatory reason for the adverse actions.  These reasons are discussed above, in the context of element (2) (i.e., whether plaintiff was performing his job satisfactorily at the time of the adverse actions).  CSK has identified non-discriminatory reasons for the "corrective actions" it took in August 2010 – it believed that plaintiff had missed nine scheduled shifts in a two-month period, and also believed that plaintiff was discussing his lawsuit on company time and refusing to be in the same room with VandenBos and Salazar.  And in November 2010, CSK believed that plaintiff had acted unprofessionally towards a customer.  As long as CSK "honestly believed its reasons for its actions," even if they were "foolish or trivial or even baseless," the burden would shift back to plaintiff to show that CSK's proffered reasons were pretextual.  Villiarimo, 281 F.3d at 1063.  Here, the court finds that CSK has met its burden, thus shifting the burden back to plaintiff.

As to the August 2010 disciplinary actions, plaintiff offers only the conclusory statement that "defendant's purported reason for the disparate treatment in disciplining plaintiff for these matters is plainly pretextual."  Plaintiff also alleges that he "was treated less favorably than the Caucasian store manager," but that does not serve to undermine

33

United States District Court
For the Northern District of California

1   CSK's proffered non-discriminatory reason.  Notably, plaintiff does not mention the "Tora

2   Tora Tora" comments in the context of the August 2010 disciplinary actions, presumably

3   because the disciplinary actions were issued by Randy Brunell, who did not participate in

4   the "Tora Tora Tora" comments.  Regardless, even if plaintiff had pointed to those

5   comments as showing pretext, plaintiff would still be unable to meet his burden, because

6   he has shown no connection between those comments (or any other discriminatory

7   behavior) and the two corrective actions issued in August 2010.  And as discussed above,

8   even if CSK's reasons for issuing the corrective actions were "foolish or trivial or even

9   baseless," plaintiff still has the burden to show that the reasons were not honestly believed

10  and were merely a pretext for discrimination.  Plaintiff has not done so with respect to the

11  August 2010 disciplinary actions.

12      As to the November 2010 termination, plaintiff does point to the "Tora Tora Tora"

13  comments, arguing that Salazar (who participated in making the comments) was involved

14  in the decision to terminate.  CSK responds by arguing that Salazar was not the main

15  decision-maker, and that four other individuals (with no connection to the "Tora Tora Tora"

16  comments) were involved in the termination decision.  Regardless of the specifics of

17  Salazar's involvement, the court finds that plaintiff has failed to show any connection

18  between the "Tora Tora Tora" comments, the last of which occurred in December 2008,

19  and the termination decision nearly two years later.  Not only are those comments too

20  remote in time to show that the actual termination decision was based on racial

21  discrimination, they do not undermine CSK's proffered reason, which was that plaintiff was

22  terminated because he yelled and used expletives at a customer.  Plaintiff's reference to

23  the absence of non-Asian district managers similarly fails to raise a triable issue as to

24  whether CSK's proffered reason was pretextual.  Accordingly, the court GRANTS

25  defendant's motion for summary judgment on plaintiff's Title VII discrimination claim.

26      As part of his first cause of action, plaintiff also asserts a Title VII harassment claim,

27  based on race-based harassment.  The relevant legal standard for Title VII harassment is

28  the same as for FEHA harassment; namely, a plaintiff must show that (1) he was subjected

34

United States District Court

For the Northern District of California

1  to verbal or physical conduct because of his race, (2) that the conduct was unwelcome, and

2  (3) that the conduct was sufficiently severe or pervasive as to alter the conditions of the

3  plaintiff's employment and create an abusive work environment.  Manatt, 339 F.3d at 798.

4      Plaintiff's opposition brief mentions only that "after he was demoted to 'store

5  manager' he was treated as an assistant manager or clerk, with no responsibilities beyond

6  working the cash register, stocking shelves, and waiting on customers and that this conduct

7  evidenced further harassment based on plaintiff's age, race, and/or national origin."  These

8  allegations do not even meet element (1) of a harassment claim, that plaintiff was

9  subjected to verbal or physical conduct because of his race, let alone element (3), that the

10 conduct was sufficiently severe or pervasive to alter the conditions of plaintiff's employment

11 and create an abusive work environment.  Essentially, plaintiff complains that he was

12 assigned tasks that he found to be menial.  These allegations cannot support a claim of

13 harassment.  And because the court has already found the harassment allegations in

14 Yoshimoto I insufficient to withstand summary judgment, even if those allegations are

15 incorporated here, plaintiff would still be unable to raise a triable issue of fact on his

16 harassment claim.  Accordingly, defendant's motion for summary judgment is GRANTED

17 as to plaintiff's Title VII harassment claim in Yoshimoto II.

18     The final component of plaintiff's Title VII claim is a claim for retaliation.  To make

19 out a prima facie case of retaliation under Title VII, a plaintiff must establish that (1) he

20 engaged in a protected activity, (2) that his employer subjected him to an adverse

21 employment action, and (3) that a causal link exists between the protected activity and the

22 adverse action.  Freitag v. Ayers, 468 F.3d 528, 541 (9th Cir. 2006).

23     As to element (1), plaintiff claims that he was retaliated against for filing his DFEH

24 charges in November and December 2009, for filing Yoshimoto I in February 2010, and for

25 taking FMLA leave from November 2009 to March 2010.  The court finds that plaintiff has

26 met element (1) of a prima facie retaliation case.

27     As discussed above, plaintiff's August 2010 disciplinary actions and November 2010

28 termination do constitute "adverse employment actions," and thus plaintiff does meet

United States District Court

For the Northern District of California

1    element (2) of a prima facie retaliation case.

2         However, as discussed above, CSK has presented evidence of a legitimate, non-

3    discriminatory reason for each of the adverse actions, and plaintiff has not presented any

4    other evidence showing that CSK took the adverse actions for reasons different than those

5    proffered, let alone any evidence that CSK took the adverse actions in retaliation for plaintiff

6    engaging in protected activity.  Thus, plaintiff cannot meet element (3) of a prima facie

7    retaliation case under Title VII, and the court GRANTS defendant's motion for summary

8    judgment, which serves to dispose of plaintiff's entire first cause of action.

9         II.     National origin discrimination under FEHA

10        As set forth above, to establish a prima facie case, plaintiff must show that he (1)

11   belongs to a protected class, (2) was performing according to his employer's legitimate

12   expectations, (3) suffered an adverse employment action, and (4) that other employees

13   with qualifications similar to his own were treated more favorably, or that the employer had

14   a discriminatory motive.  See McDonnell Douglas, 411 U.S. at 802; Guz, 24 Cal.4th at 355.

15   Once a plaintiff establishes a prima facie case of discrimination, the burden shifts to the

16   employer to offer a legitimate, nondiscriminatory reason for the adverse employment

17   decision.  See Reeves, 530 U.S. at 142.   If the employer meets this burden, the plaintiff

18   must then raise a triable issue of material fact as to whether the defendant's proffered

19   reasons for its actions are a mere pretext for unlawful discrimination.  Hawn, 615 F.3d at

20   1155.

21        As to elements (1) and (4), the analysis from Yoshimoto I's FEHA discrimination

22   claim applies equally here.  Plaintiff is Japanese-American, which meets element (1), and

23   the "Tora Tora Tora" comments arguably meet element (4) by suggesting a discriminatory

24   motive.

25        As to element (2), the court incorporates its analysis with respect to plaintiff's Title

26   VII discrimination claim.  While plaintiff may have been performing according to

27   expectations at the time of the August 2010 disciplinary actions, he was not performing to

28   expectations at the time of his termination in November 2010.  Regardless, the court will

United States District Court

For the Northern District of California

1  assume that plaintiff has established element (2) with regard to both adverse actions, in

2  order to fully consider plaintiff's allegations of pretext.  And as discussed above, element

3  (3) of a prima facie discrimination case is met by plaintiff's August 2010 disciplinary actions

4  and his November 2010 termination.

5        Assuming the burden shifts to CSK under McDonnell Douglas, the court finds that

6  CSK's has presented evidence of legitimate, non-discriminatory reasons for the adverse

7  actions, based on the same reasons as described above, in the context of plaintiff's Title VII

8  discrimination claim.  And the court also finds that plaintiff has failed to show evidence of

9  pretext for the same reasons described above, and thus has failed to raise a triable issue

10  as to whether the adverse actions were the result of national origin discrimination.

11  Accordingly, the court GRANTS defendant's motion for summary judgment on plaintiff's

12  claim for national origin discrimination under FEHA in Yoshimoto II.

13        III.    Racial discrimination under FEHA

14        This claim is substantively identical to plaintiff's claim of national origin discrimination

15  under FEHA in Yoshimoto II, and the court GRANTS defendant's motion for summary

16  judgment on plaintiff's claim for racial discrimination under FEHA for the same reasons

17  discussed above.

18        IV.    Disability discrimination under FEHA

19        To establish a prima facie case of disability discrimination under FEHA, the

20  employee must demonstrate that: (1) plaintiff is a person with a disability or medical

21  condition; (2) defendant made an adverse employment decision; (3) because of plaintiff's

22  disability or medical condition.  See Green v. State of Cal., 132 Cal.App.4th 97, 110 (2005).

23  If plaintiff can establish a prima facie case, the McDonnell Douglas burden-shifting analysis

24  applies.

25        As to element (1), plaintiff claims that he suffers from a stress-related disability.  The

26  court assumes, without deciding, that this is sufficient to satisfy element (1) of a prima facie

27  disability discrimination case.

28        As to element (2), plaintiff appears to identify the denial of requested

United States District Court

For the Northern District of California

1    accommodations as the "adverse employment decision."  However, any claim for failure to

2    accommodate a requested reasonable accommodation should have been pled as a claim

3    for "failure to accommodate" under FEHA or "failure to engage in the interactive process"

4    under FEHA.  Regardless, the court will address plaintiff's claims as if they were properly

5    pled, but first notes that neither of the two adverse actions mentioned above (the August

6    2010 disciplinary actions or the November 2010 termination) could underlie any claim for

7    disability discrimination.  Plaintiff has provided no evidence that either action was the result

8    of disability-based discrimination, and even if he did succeed in establishing a prima facie

9    case of disability discrimination, CSK has identified legitimate, non-discriminatory reasons

10   for both adverse actions, which are discussed above.  And because plaintiff identifies no

11   evidence showing that CSK's proffered reasons were pretextual, the court finds that plaintiff

12   cannot raise a triable issue of fact that the August 2010 disciplinary actions or the

13   November 2010 termination were the result of disability-based discrimination.

14        Regardless, out of an abundance of caution, the court will treat plaintiff's claim as a

15   claim for failure to provide reasonable accommodation.  An employer must provide a

16   reasonable accommodation for an employee with a known mental or physical disability

17   unless the accommodation would cause undue hardship.  See Cal. Gov. Code. §

18   12940(m).  Failure to do so is an unlawful employment practice for which a damages action

19   will lie.  See id. at § 12965.  Where an employee requests reasonable accommodation, an

20   interactive process is required, whereby the disabled employee and the employee

21   communicate in selecting an appropriate accommodation.  Green, 132 Cal.App.4th at 118.

22   The onus is on the employee to initiate the interactive process.  See Jensen v. Wells Fargo

23   Bank, 85 Cal. App. 4th 245, 266 (2000).

24        Plaintiff claims that he requested the accommodation of having his hours restricted

25   to no later than 6:00pm, that CSK refused, and that he "had no choice but to withdraw his

26   requested accommodation."  CSK argues that it had a non-discriminatory reason for

27   denying the requested accommodation, namely, that it needed one store manager to be at

28   the store at all times.  CSK further argues that, as a modified accommodation, it offered

38

United States District Court

For the Northern District of California

1   plaintiff one of two non-manager positions that would allow plaintiff to leave work by

2   6:00pm.  See Yoshimoto II, Dkt. 76-3, ¶ 16.  Plaintiff then told CSK that the "no work after

3   6:00pm" restriction would be "temporary," and received a full work release shortly after.  Id.,

4   ¶ 18.  Plaintiff alleged that he was "forced" to provide a full work release, but CSK responds

5   that it specifically told plaintiff that it would consider any requested accommodations if his

6   doctor felt that they were needed.  Id., ¶ 17, 18.  Critically, CSK also provides evidence

7   showing that plaintiff previously requested an accommodation to restrict his hours to no

8   later than 7:30pm, which was granted.  See Yoshimoto II, Dkt. 76-14, Ex. 56.  In that letter,

9   CSK also granted plaintiff's request not to work Thursdays so that he could attend

10  appointments.  Id.  Overall, the evidence shows that CSK did engage in an interactive

11  process with plaintiff, and while it ultimately did not grant plaintiff's second desired

12  accommodation, it did offer a reasonable alternative before plaintiff withdrew his request.

13  Accordingly, defendant's motion for summary judgment is GRANTED on plaintiff's claim for

14  disability discrimination, and on any claim for failure to provide reasonable accommodation

15  or failure to engage in the interactive process.

16          V.      Age discrimination under FEHA

17          A prima facie case of age discrimination arises when the employee shows: (1) at the

18  time of an alleged adverse employment action, the employee was 40 years of age or older;

19  (2) an adverse action was taken against the employee; (3) at the time of the adverse action

20  the employee was satisfactorily performing his job; and (4) some other circumstance

21  suggesting a discriminatory motive was present.  See Guz, 24 Cal.4th at 355.  If plaintiff

22  can establish a prima facie case, the McDonnell Douglas burden-shifting analysis applies.

23          As in Yoshimoto I, plaintiff meets element (1) of his prima facie case, because he

24  was over 40 at the time of the alleged adverse actions.  Specifically, the adverse actions

25  are the disciplinary actions taken against plaintiff in August 2010, and the termination of

26  plaintiff's employment in November 2010, both of which meet element (2) of the prima facie

27  case.

28          As to element (3), the court incorporates its analysis above, made in the context of

United States District Court
For the Northern District of California

1    plaintiff's Title VII claim.  The court assumes that plaintiff was performing according to

2    expectations at the time of his August 2010 discipline, but based on the yelling incident with

3    a customer, the court finds that plaintiff was not performing according to expectations at the

4    time of his November 2010 termination.  However, the court will continue to analyze both

5    adverse actions under the McDonnell Douglas burden-shifting test.

6         As to element (4), plaintiff first relies on the same evidence of age discrimination that

7    he presented in Yoshimoto I (i.e. the comments about grey hair and having two employees

8    "for the price of one").  However, plaintiff also relies on evidence regarding "a number of

9    CSK district managers and regional managers in their 40s and 50s who were demoted or

10   terminated and replaced with younger workers for less pay."  Plaintiff does make clear that

11   he "is not alleging a 'disparate impact' case or relying on statistical evidence," but instead,

12   argues that "[t]estimony of other employees about their treatment by the defendant is

13   relevant to the issue of the employer's discriminatory intent."  The court finds that plaintiff

14   has met element (4) of a prima facie age discrimination case.

15        Assuming that plaintiff has established a prima facie case of discrimination, the

16   burden would then shift to CSK to identify a legitimate, non-discriminatory reason for the

17   adverse actions.  Here, the court again incorporates its analysis from plaintiff's Title VII

18   claim, and finds that the August 2010 disciplinary actions were based on CSK's belief that

19   plaintiff had missed nine scheduled shifts in a two-month period, that plaintiff was

20   discussing his lawsuit during company time, and that plaintiff was refusing to be in the

21   same room as VandenBos and Salazar.  The November 2010 termination was based on

22   CSK's belief that plaintiff had acted unprofessionally towards a customer.  These reasons

23   are sufficient to shift the burden back to plaintiff to show that CSK's proffered reasons were

24   pretextual.

25        As to the August 2010 disciplinary action, plaintiff appears to rely on the same

26   evidence that he presented in Yoshimoto I, namely, the comments about his greying hair

27   and his salary.  Plaintiff's new evidence regarding CSK's treatment of older workers relates

28   only to the alleged demotion and termination of older employees, and thus, the court

United States District Court

For the Northern District of California

1   considers only the age-related comments as evidence that plaintiff's August 2010

2   disciplinary actions were based on reasons that were pretexts for age-based discrimination.

3   And, as in Yoshimoto I, the court finds that plaintiff has not presented "evidence tying the

4   alleged discriminatory comments to any adverse action," and thus finds that plaintiff has not

5   raised a triable issue of fact as to whether the August 2010 disciplinary actions were the

6   result of age-based discrimination.  See Cozzi, 787 F.Supp.2d at 1060 (citing Nidds, 113

7   F.3d at 919).

8        As to the November 2010 termination, the court does find that plaintiff's evidence

9   regarding CSK's treatment of older employees is indeed relevant to a possible

10  discriminatory motive.  And, if plaintiff's conduct during the November 2010 customer

11  incident had not been so egregious, the court might be inclined to find that plaintiff has

12  indeed raised a triable issue of fact as to whether his own termination was the result of a

13  discriminatory motive.  However, after yelling at a customer in his store (including the

14  phrase "fuck you and your BMW"), plaintiff cannot raise a triable issue as to whether his

15  termination was actually the result of discrimination.  Given that customer service is

16  sometimes the only thing that distinguishes competitors, the egregiousness of plaintiff's

17  conduct cannot be overstated, particularly given his status as a manager who was

18  supposed to be setting an example for his subordinates.

19       The yelling incident also prevents the court from considering plaintiff to be "similarly

20  situated" to the other employees who were demoted or terminated by CSK.  In Vasquez v.

21  County of Los Angeles, the Ninth Circuit found that the plaintiff-employee was not "similarly

22  situated" to other employees (thus preventing any showing of pretext) because the other

23  employees were "not involved in the same type of offense as" the plaintiff and had "not

24  engage[d] in problematic conduct of comparable seriousness to that of" the plaintiff, who

25  had "disobey[ed] a direct order" from his supervisor.  349 F.3d 634, 641 (9th Cir. 2003).

26  Critically, the "problematic conduct" in Vasquez was plaintiff's participation in a football

27  game after being told that he was not allowed to participate.  Id. at 638-39.  If playing in a

28  football game was enough to preclude a finding that the Vasquez plaintiff was similarly

United States District Court

For the Northern District of California

1   situated to other employees, and to prevent a finding of pretext, then certainly plaintiff's

2   having yelled "fuck you and your BMW" to a customer is sufficient to compel the same

3   result in this case.  Accordingly, the court finds that plaintiff cannot raise a triable issue of

4   fact that either adverse action was the result of age-based discrimination, and thus

5   GRANTS defendant's motion for summary judgment on plaintiff's claim for age

6   discrimination under FEHA.

7           VI.     Age discrimination under ADEA

8           Plaintiff's ADEA claim is subject to the same McDonnell Douglas burden-shifting

9   analysis as is his FEHA age discrimination claim.  The only difference is that  "a plaintiff

10  bringing a disparate-treatment claim pursuant to the ADEA must prove, by a

11  preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse

12  employment action."  Gross v. FBL Fin. Servs., 129 S.Ct. 2343, 2352 (2009).

13          Thus, the court incorporates its analysis of plaintiff's FEHA age discrimination claim,

14  and further finds that plaintiff's inability to present evidence that CSK's proffered reasons

15  for the adverse actions were pretextual also precludes him from establishing that age was

16  the "but-for" cause for the adverse actions.  Accordingly, the court GRANTS defendant's

17  motion for summary judgment as to plaintiff's ADEA claim.

18          VII.    Retaliation under FEHA

19          In order to make out a prima facie case of retaliation, a plaintiff must establish that

20  (1) he acted to protect his FEHA rights, (2) that an adverse employment action was

21  thereafter taken against him, and (3) that a causal link exists between those two events.

22  See Steiner, 25 F.3d at 1465.  This claim is identical to plaintiff's retaliation claim under

23  Title VII (discussed above), and the court GRANTS defendant's motion for summary

24  judgment of this claim for the same reasons.

25          VIII.   Harassment under FEHA

26          The court has addressed plaintiff's Title VII harassment claim above, and also noted

27  that the legal standard for Title VII harassment is the same as for FEHA harassment.

28  Thus, the court GRANTS defendant's motion for summary judgment on plaintiff's FEHA

United States District Court

For the Northern District of California

1    harassment claim for the same reasons set forth above.

2           IX.    Failure to prevent discrimination/harassment under FEHA

3           As plaintiff has failed to overcome summary judgment as to his underlying

4    discrimination and harassment claims, defendant is entitled to summary judgment on

5    plaintiff's "failure to prevent" claim.  See Lelaind, 576 F.Supp.2d at 1103 (a 'failure to

6    prevent' claim requires a showing that "plaintiff was subjected to discrimination, harassment

7    or retaliation").  Accordingly, the court GRANTS defendant's motion for summary judgment

8    as to plaintiff's claim for failure to prevent discrimination/harassment under FEHA in

9    Yoshimoto II.

10          X.     Violation of California Constitution Article I, Section 8

11          Article I, Section 8 of the California Constitution provides that "[a] person may not be

12   disqualified from entering or pursuing a business, profession, vocation, or employment

13   because of sex, race, creed, color, or national or ethnic origin."  As applied to this case,

14   only the "race" and "national or ethnic origin" clauses are relevant.  Plaintiff's opposition

15   brief indicates that he only intends this claim to apply to his November 2010 termination,

16   but even if the court were to consider both the termination and the August 2010 disciplinary

17   actions, the court finds that plaintiff has failed to show that any adverse action was

18   "because of" his race or national or ethnic origin, for the same reasons discussed above, in

19   the context of plaintiff's Title VII claim.  In short, CSK has presented a legitimate, non-

20   discriminatory reason for each adverse action, which precludes any finding that the adverse

21   actions were "because of" plaintiff's race or national/ethnic origin.  Accordingly, the court

22   GRANTS defendant's motion for summary judgment on plaintiff's claim under the California

23   Constitution in Yoshimoto II.

24          XI.    Violation of Cal. Labor Code § 98.6

25          As applied to this case, California Labor Code § 98.6 prohibits an employer from

26   "discharg[ing] an employee or in any manner discriminat[ing] against any employee or

27   applicant for employment because the employee" engaged in protected activity, including

28   the filing of an administrative charge or a lawsuit.  The court finds that this claim is

United States District Court

For the Northern District of California

1   substantively the same as plaintiff's Title VII and FEHA retaliation claims, and the court

2   similarly finds that plaintiff is unable to raise a triable issue of fact regarding the causation

3   element of this claim.  CSK has presented evidence that each adverse action was taken for

4   a legitimate, non-discriminatory reason, and plaintiff has failed to present evidence showing

5   why such reasons were pretextual.  Thus, plaintiff cannot establish that he was discharged

6   or discriminated against "because" he engaged in protected activity, and the court

7   GRANTS defendant's motion for summary judgment on plaintiff's claim under Cal. Labor

8   Code § 98.6.

9          XII.   Violation of Cal. Labor Code § 1102.5

10         As applied to this case, California Labor Code § 1102.5 prohibits an employer from

11  "retaliat[ing] against an employee for disclosing information to a government or law

12  enforcement agency, where the employee has reasonable cause to believe that the

13  information discloses a violation of state or federal statute, or a violation or noncompliance

14  with a state or federal rule or regulation."  The court finds that this claim, like plaintiff's other

15  Labor Code claim, is substantively the same as plaintiff's Title VII and FEHA retaliation

16  claims, and thus GRANTS defendant's motion for summary judgment on plaintiff's claim

17  under Cal. Labor Code § 1102.5.

18         XIII.   Wrongful termination in violation of public policy

19         To establish a claim of wrongful discharge in violation of public policy under

20  California law, plaintiff must show: (1) that he was terminated from his employment, (2) that

21  the termination was a violation of public policy, i.e., that there was a nexus between the

22  termination and the plaintiff's status or protected activity, (3) and damages.  Turner v.

23  Anheuser-Busch, Inc., 7 Cal.4th 1238, 1258-59 (1994).  California courts apply the

24  traditional McDonnell Douglas burden-shifting analysis in cases alleging violation of state

25  anti-discrimination laws.  See, e.g., Nelson v. United Tech., 74 Cal.App.4th 597, 613

26  (1999).

27         Plaintiff alleges that there are fundamental public policies against discrimination

28  based on race, age, national origin, physical disability, medical condition, or the taking of

44

United States District Court

For the Northern District of California

1   medical leave, and against retaliation for opposing discriminatory practices.  The court

2   agrees that those public policies could support a wrongful termination claim, but finds that

3   plaintiff fails to establish the required nexus between those policies and plaintiff's actual

4   termination.  As discussed above, CSK has presented evidence that plaintiff was

5   terminated for yelling at a customer in his store in an exchange that included plaintiff yelling

6   "fuck you and your BMW" to the customer.  Under these facts, the court finds that plaintiff

7   has failed to raise a triable issue of fact that there is a nexus between his termination and

8   his status or protected activity.  Accordingly, the court GRANTS defendant's motion for

9   summary judgment on plaintiff's claim for wrongful termination in violation of public policy in

10  Yoshimoto II.

**CONCLUSION**

12        Defendant's motions for summary judgment are GRANTED on all of plaintiff's claims

13  in both actions.  The Clerk shall close both files.

14        **IT IS SO ORDERED.**

15  Dated: December 9, 2013

16                                                              _____
                                                                PHYLLIS J. HAMILTON
17                                                              United States District Judge

18

19

20

21

22

23

24

25

26

27

28