Higgs Fletcher & Mack LLP
JAMES M. PETERSON, Bar No. 137837
peterson@higgslaw.com
JASON C. ROSS, Bar No. 252635
rossj@higgslaw.com
401 West "A" Street, Suite 2600
San Diego, CA  92101-7913
Telephone:     619.236.1551
Facsimile:      619.696.1410

Attorneys for Defendant
CSK AUTO, INC.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| NORMAN YOSHIMOTO,<br><br>                              Plaintiff,<br><br>v.<br><br>O'REILLY AUTOMOTIVE, INC., a Missouri corporation, CSK AUTO, INC., an Arizona Corporation, and DOES 1 through 100, inclusive,<br><br>                              Defendants. | CASE NO.: 10-CV-05438 (PJH)<br><br>**DEFENDANT'S MEMORANDUM OF POINTS & AUTHORITIES ON MOTION FOR ATTORNEYS' FEES**<br><br>HEARING:      March 19, 2014<br>TIME:            9:00 a.m.<br>DEPT:           Courtroom 3<br>JUDGE:         Hon. Phyllis J. Hamilton<br>TRIAL DATE:   Formerly March 14, 2014 |
| NORMAN YOSHIMOTO,<br><br>                              Plaintiff,<br><br>v.<br><br>O'REILLY AUTOMOTIVE, INC., a Missouri corporation, CSK AUTO, INC., an Arizona corporation,<br><br>                              Defendants. | CASE NO.: 11-CV-03119 (PJH)<br><br><br>CASE FILED:    June 24, 20ll |

Higgs Fletcher & Mack LLP
Attorneys At Law
San Diego

1171538.2

10-CV-05438 (PJH) & 11-CV-03119 (PJH)
P&A's on Mtn for Attys' Fees

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   FACTUAL AND PROCEDURAL BACKGROUND ........................................ 2

    A.    *Yoshimoto I* Facts .................................................................................. 2

    B.    *Yoshimoto II* Facts ................................................................................ 6

    C.    The Court's Order on Summary Judgment ............................................ 8

        1.    *Yoshimoto I* Order ..................................................................... 8
        2.    *Yoshimoto II* Order .................................................................... 9

    D.    General standard for Awarding a Prevailing Defendant Fees .............. 10

III.  DEFENDANT IS THE PREVAILING PARTY .............................................. 10

IV.   BOTH CASES MEET THE STANDARD FOR AWARDING A PREVAILING DEFENDANT ITS FEES ................................................................................. 11

    A.    Standard on the Motion ....................................................................... 11

    B.    *Yoshimoto II* was Patently Meritless from the Outset ........................ 11

    C.    *Yoshimoto I* Also Meets the Standard for Awarding Defendant Fees ................. 14

    D.    Conclusion ........................................................................................... 18

V.    A FEE AND COSTS AWARD OF $398,145.51 SHOULD BE ENTERED FOR DEFENDANTS ................................................................................................ 18

    A.    CSK's Requested Attorneys' Fee Award are Reasonable ................... 18

        1.    Standard ...................................................................................... 18
        2.    CSK's Attorneys' Fees ............................................................... 18
        3.    Costs Award ............................................................................... 20

VI.   CONCLUSION ................................................................................................. 20

Higgs Fletcher &
Mack LLP
Attorneys At Law
San Diego

i

10-CV-05438 (PJH) & 11-CV-03119 (PJH)
P&A's on Mtn for Attys' Fees

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page**

3

### <u>Cases</u>

*Baker v. Mulholland Sec. and Patrol, Inc.*
204 Cal.App.4th 776, 782-83 (2012) ...................................................................... 20

*Bihun v. AT&T Info. Sys., Inc.*
13 Cal.App.4th 976, 997-998 (1993) ...................................................................... 19

*Bond v. Pulsar Video Prod,*
50 Cal.App.4th 918, 924 (1996) ............................................................................. 13

*Christianburg Garment Co. v. EEOC*
434 U.S. 412, 421 (1978) ........................................................................................ 11

*Cummings v. Benco Building Serv.*
11 Cal.App.4th 1383, 1386-1387 (1992) ................................................ 11, 13, 14, 17

*Gonzales v. Metpath, Inc.*
214 Cal.App.3d 422, 426, 428 (1989) .................................................................... 13

*Guthrey v. State of Cal.*
63 Cal.App.4th 1108, 1111 (1998) .......................................................................... 13

*Guz v. Bechtel Nat'l, Inc.*
24 Cal.4th 317, 362 (2000) ..................................................................................... 12

*Harris v. Marhoefer*
24 F.3d 16, 20 (9th Cir. 1994) ................................................................................. 20

*Hensley v. Eckerhart*
461 U.S. 424, 433 (1980) ........................................................................................ 18

*Hersant v. Dept. of Social Serv.*
57 Cal.App.4th 997, 1005 (1997) ............................................................................ 17

*Hewitt v. Helms*
482 U.S. 755, 760 (1987) ........................................................................................ 10

*Jersey v. John Muir Med. Ctr.*
97 Cal.App.4th 814, 832 (2002) .............................................................................. 11

*Marbled Murrelet v. Babbitt*
182 F.3d 1091, 1096 (9th Cir. 1999) ....................................................................... 11

*Moosa v. Dolan Foster Enterprises, Inc.*
1998 WL 30060 (N.D.Cal. Jan. 5, 1998) ................................................... 13, 14, 18

*Moss v. Assoc. Press*
956 F.Supp.891, 895 (C.D.Cal. 1996) .................................................................... 14

HIGGS FLETCHER &
MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

ii

10-CV-05438 (PJH) & 11-CV-03119 (PJH)
P&A's on Mtn for Attys' Fees

# TABLE OF AUTHORITIES
### (continued)

Page

*Rodas v. McCullough,*
2013 WL 5400287, *2 (N.D.Cal. Sept. 26, 2013) ...................................................... 10, 18, 19

*Villanueva v. City of Colton*
160 Cal.App.4th 1188, 1200 (2008)..................................................................................... 11, 13

*Winterrowd v. Am. General Annuity Ins. Co.*
556 F.3d 815, 827 (9th Cir. 2009)................................................................................................. 18

## Statutes

Cal. Government Code section 12965(b)........................................................ 1, 10, 11, 14, 18, 20

Cal. Labor Code § 1102.5 ............................................................................................................ 7

Cal. Labor Code § 98.6 ................................................................................................................ 7

Cal. Labor Code section 2699 ...................................................................................................... 7

Cal. Labor Code sections 203 ...................................................................................................... 7

## Federal Statute

42 U.S.C. § 2000e-5(k) .............................................................................................. 1, 10, 18, 20

Higgs Fletcher &
Mack LLP
Attorneys At Law
San Diego

iii

10-CV-05438 (PJH) & 11-CV-03119 (PJH)
P&A's on Mtn for Attys' Fees

Defendant CSK AUTO, INC. ("CSK") respectfully submits this Memorandum of Points & Authorities on its Motion for Attorneys' Fees against Plaintiff NORMAN YOSHIMOTO ("Plaintiff") following the Court's entry of summary judgment in the related cases (both before Judge Hamilton) 10-05438 ("*Yoshimoto I*") and 11-03119 ("*Yoshimoto II*").

## I.

## <u>INTRODUCTION</u>

These are two related employment lawsuits.  CSK moved for summary judgment in both cases, which the Court granted in full.[1] (Docket No. 132 [Case 10-cv-05438]; Docket No. 94 [Case 11-03119].)  It then entered judgment for CSK in both cases. (Docket No. 133 [Case 10-05438]; Docket No. 95 [Case 11-03119].)  CSK brings this motion for attorneys' fees under Cal. Government Code section 12965(b) (the "Fair Employment and Housing Act, or "FEHA") and 42 U.S.C. section 2000e-5(k) (Title VII) as the prevailing defendant in these cases.

In *Yoshimoto I*, Plaintiff filed nine causes of action (mostly under FEHA) relating to his allegedly discriminatory and retaliatory discipline from 2006 to 2009, including corrective actions, being placed on probation, failure to promote, and demotion.  The case was groundless from its inception.  Before CSK demoted Plaintiff in 2009, it warned him <u>eight</u> times he needed to change his management style, and improve his interpersonal skills.  He never disputed this legitimate reason, or the underlying incidents.  Instead, he recklessly refused to change, citing his "strong" numbers, and arguing CSK was "wrong" to think he needed to alter his approach  When Plaintiff did not change, CSK demoted him.  He then filed for discrimination, harassment (age, race, national origin) and retaliation with *no* evidence.  When CSK moved for summary judgment, the Court found Plaintiff had never disputed the facts supporting CSK's actions, his claims defied law, and he had not met his prima facie case on *any* claim.

In *Yoshimoto II*, filed after Plaintiff's demotion to store manager, Plaintiff told a customer "I can't believe you own a fuckin' BMW and can't afford to buy the tool," and "fuck you and

---

[1]     The Court issued one order covering both motions, which was filed in both cases.  Thus, unless stated otherwise, all subsequent references are to the "Order," which refers equally to Docket No. 132 [Case 10-cv-05438] and Docket No. 94 [Case 11-03119], which are identical.

Higgs Fletcher & Mack LLP
Attorneys At Law
San Diego

1171538.2

10-CV-05438 (PJH) & 11-CV-03119 (PJH)
P&A's on Mtn for Attys' Fees

your BMW." He did this in a crowded store, as the ranking manager. He admitted the incident, both before the lawsuit (under oath), and during the lawsuit; he *never* denied it. He also admitted his behavior violated known CSK rules, and that CSK had a legitimate reason to terminate him. Yet he filed *Yoshimoto II* in June 2011 anyways, asserting 15 causes of action, mainly for Title VII and FEHA discrimination, harassment (age, disability, race, national origin) and retaliation, claiming his termination was unlawful. This case is the very picture of frivolous and, not surprisingly, the Court granted CSK summary judgment, finding Plaintiff failed to meet his prima facie case on any of his claims.

Under both FEHA and Title VII, CSK, as prevailing defendant, is entitled to its fees for *both* cases, because they were frivolous, unreasonable, groundless or vexatious at the outset. Plaintiff's conduct was extremely egregious in *Yoshimoto II*; that cannot be reasonably disputed, particularly since this Court already *ruled* it was. The egregious nature of Plaintiff's termination incident made this case groundless from inception, and is the *exact* scenario in which fees are awarded to a prevailing defendant. Fees are also proper in *Yoshimoto I* because the case never had foundation in fact or law, and because Plaintiff litigated it in the face of admitted, undisputed facts contrary to his positions. Plaintiff *never*, at any time, disputed the facts underlying his discipline, probation or demotion. He was repeatedly warned, he repeatedly defied these warnings, and admitted, before filing suit, he knew he was not meeting CSK's legitimate performance expectations. This was a groundless case that never should have been pursued. For these reasons, CSK should be awarded their attorneys' fees and expert fees in the two cases totaling $398,145.51.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    *Yoshimoto I* Facts

CSK is an auto parts retailer doing business as "O'Reilly Auto Parts." Plaintiff began with CSK in March 1998. He became a district manager in 1999. In 2001, he received a disciplinary letter telling him to improve on "effective communication" and "developing [his] team in a productive environment." It indicated failure to improve could mean demotion.

HIGGS FLETCHER &
MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

1171538.2                                       2         10-CV-05438 (PJH) & 11-CV-03119 (PJH)
                                                          P&A's on Mtn for Attys' Fees

In 2006, Plaintiff solicited $10,000 from a subordinate for his personal real estate venture. The subordinate complained of coercion and asked for his money back, which CSK helped procure. For this, CSK disciplined Plaintiff. The employee later sued CSK over the incident. (Order, p. 3:7-14.) In March 2007, Plaintiff's evaluation noted his growing interpersonal problems. Although CSK acknowledged Plaintiff's sales performance, it nevertheless noted Plaintiff "needs to work on": (*a*) "his delivery of praise and criticism;" (*b*) "his people skills;" and (*c*) "how he deals with problem associates and how to praise associates when they deserve it." It also noted Plaintiff needs "to make [people management] an area of focus for 2007," and made "continu[ing] to improve his people skills" Plaintiff's top developmental goal for 2007. Plaintiff's supervisor, Ronald Stahl, an old friend from a prior job, told Plaintiff he needed to change his management style. Plaintiff refused, saying his numbers were too good. (Case No. 10-5438, Docket No. 113-1, p. 8:25-9:6; Order, p. 3:15-26.)

Then, in October 2007, Plaintiff yelled at a subordinate, allegedly making inappropriate comments and using profanity. During the investigation, Plaintiff admitted "becoming frustrated" with the employee. CSK issued him a letter of expectation, noting this violated CSK policies, it "cannot be tolerated," and further issues may result in further discipline, including termination. (Order, p. 3:27-4:7.) In March 2008, Plaintiff's evaluation again noted his need to change his management style. Stahl gave Plaintiff a 3 / 10 under "communication and interpersonal skills," noting: (*a*) his "delivery sometimes is too harsh and this needs to be worked on in 2008;" (*b*) he "needs to work on his delivery to his team;" and, (*c*) he needs to "make sure he tones things down when he needs to so that he does not offend people." "Goal # 1" for 2008 was, like 2007, for Plaintiff "to work on his people skills and how he delivers a message to his employees." Nevertheless, Plaintiff *still* "didn't see it as a problem," and denied he needed to improve. (Order, p. 4:8-14; Case No. 10-5438, Docket No. 113-1, p. 9:20-27.)

In June 2008, Plaintiff ran an improper employee contest, verbally accosted an HR employee during the investigation, and retaliated against the complaining managers. Plaintiff set a district sales contest pitting the "new" store managers against the veterans. The losing team had to buy food and drinks (including alcohol), and cook for the winners at a Giants' game. The

winners got tickets to the game; the losers did not.  Plaintiff made the event mandatory, but refused to pay the hourly store managers for their time or expenses.  The managers complained.  HR investigated.  During the HR interview, Plaintiff got angry, and loudly screamed "this is fucking bullshit" (or similar words) several times, which he admitted.  The HR representative then *himself* complained he did "not deserve to be subjected to" profanity and unprofessional behavior, "especially when [Plaintiff] is a [d]istrict [m]anager."  Shortly thereafter, Plaintiff held a meeting with the complaining managers.  He told them they would not be paid for their time or expenses, that he was arranging another *identical* contest, and asked them one-by-one whether they were "in or out."  The managers complained this was "inappropriate and threatening."  CSK disciplined Plaintiff, noting he had shown "very poor judgment … [that] it will not be tolerated in the future," particularly since he was an experienced district manager, and had previously been warned and trained on these issues.  CSK reminded him: (*a*) to act professionally towards all employees; (*b*) he cannot retaliate against employee complaints; and (*c*) that failure to correct these problems "will most likely result in termination of employment."  CSK then transferred Plaintiff to another district.  (Order, p. 4:21-5:15; Case No. 10-5438, Docket No. 113-1, p. 10:1-11:2.)

However, employees in Plaintiff's new district still complained.  In February 2009, CSK received district-wide complaints that Plaintiff: (*1*) publicly threatened to fire two *delivery drivers* if sales did not improve; (*2*) publicly threatened a manager just back from leave that he would not be promoted due to his store's poor appearance; (*3*) discussed his personal real estate investments with a manager; (*4*) pressured one manager so much he requested a demotion to avoid Plaintiff (and feared retaliation if Plaintiff learned of the complaint); and (*5*) degraded his store managers on conference calls and spoke unprofessionally to them.  One employee in particular – the manager back from leave – started looking for a new job, told HR he had never felt so threatened in 2.5 years with CSK, and that "he has dealt with other members of management and they all make him feel like part of the team."  After investigation, CSK found merit to these claims, and put Plaintiff on probation in March 2009 for failing to heed the prior warnings about improving his management style.  CSK *again* warned Plaintiff that if he did not significantly improve, he

Higgs Fletcher &
Mack LLP
Attorneys At Law
San Diego

1171538.2                                        4                    10-CV-05438 (PJH) & 11-CV-03119 (PJH)
                                                                      P&A's on Mtn for Attys' Fees

would be disciplined again, demoted, or terminated.  Plaintiff did not challenge the underlying events; he just called the complainants "underperformers." (Order, p. 5:24-6:15; Case No. 10-5438, Docket No. 113-1, p. 11:3-12:4.)

Around the same time, Plaintiff's 2008 evaluation gave Plaintiff "needs improvement" marks in "leadership/management skills," noting he "clearly needs to improve his communication and motivational skills."  Overall, Stahl emphasized Plaintiff "needs to improve on his people skills," and *again* made this Plaintiff's top "developmental plan" for the third consecutive year.  Because management skills are weighted heavily on the evaluation, Stahl rated Plaintiff as "needs improvement," meaning he "[f]ail[ed] to perform function at adequate level; improvement needed and expected."  Despite this, Plaintiff *again* insisted he did not need to improve.  (Case No. 10-5438, Docket No. 113-1, p. 11:22-12:4.)

On April 3, 2009, Plaintiff missed a pre-scheduled store inventory.  Without him, the inventory service could not open the store, and CSK incurred a cancellation fee.  Plaintiff claims Stahl "set him up" by not providing advance notice.  However, CSK sent Plaintiff the inventory schedule on March 10, 2009, listing that exact inventory, and CSK loss prevention schedules inventories in conjunction with an *independent* inventory service (RGIS), not Stahl.  Further, after missing the inventory, Plaintiff asked for proof CSK sent the schedule.  Loss prevention forwarded the original e-mail, stating "[h]ere is the email I sent out on 03/10 for the 2nd Quarter, I looked and your email was on the list."  Plaintiff admits the e-mail addresses on both e-mails were his.  (Case No. 10-5438, Docket No. 113-1, p. 12:8-18; Order, p. 6:16-27.)

On April 6, Plaintiff took a leave of absence.  On June 8, he filed a DFEH charge alleging discrimination (race, age, national origin) and retaliation for alleged acts in March and April 2009.  On July 1, 2009, Plaintiff returned from leave.  After Plaintiff's return, employees continued to lodge complaints.  As a result of the continued complaints, CSK decided to demote Plaintiff to store manager for failing to improve after *many* unheeded warnings.  On November 2, 2009, Stahl and others met with Plaintiff, presented his demotion papers, and discussed the recent complaints.  They told Plaintiff he had failed to improve his communication and leadership skills as warned, was therefore being demoted, and that, if he still did not improve, he would likely be

HIGGS FLETCHER &
MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

1171538.2                                    5              10-CV-05438 (PJH) & 11-CV-03119 (PJH)
                                                                    P&A's on Mtn for Attys' Fees

1   terminated.  Nevertheless, Plaintiff *still* denied he needed to change, arguing his "proven track

2   record showed [he] had been very successful in the past, so why did [he] need to change what was

3   working for [him]?"  (Order, p. 7:26-8:17; Case No. 10-5438, Docket No. 113-1, p. 12:23-13:14.)

4          Within days, Plaintiff took another leave of absence.  On November 6, 2009, he filed

5   another DFEH charge for discrimination (race, age, and national origin) and retaliation.  In

6   December, Plaintiff filed an amended charge.  On February 10, 2010, he filed *Yoshimoto I*.

7   (Order, p. 8:18-23; Case No. 10-5438, Docket No. 113-1, p. 13:15-23.)  *Yoshimoto I* originally

8   alleged nine claims.  However, only six remained once the case was removed to federal court: (*1*)

9   FEHA national origin discrimination; (*2*) FEHA race discrimination; (*3*) FEHA age

10  discrimination; (*4*) FEHA retaliation; (*5*) FEHA harassment; (*6*) and FEHA failure to prevent

11  discrimination and harassment.[2]

12  **B.    *Yoshimoto II* Facts**

13         After he filed *Yoshimoto I*, Plaintiff returned from leave (March 2010), acting "above the

14  law."  On *nine* occasions from June to August 2010, he failed to work his assigned shifts.  In

15  August 2010, his new boss, district manager Randy Brunell, thus disciplined him under CSK's

16  attendance policy, which requires discipline for just four attendance violations in six months

17  (Plaintiff had *nine* in *two* months).  Plaintiff did not deny the violations, and testified he knew it

18  violated CSK policy not to work his assigned shifts.  At the same time, CSK disciplined Plaintiff

19  for discussing his lawsuit with staff in the store, on-the-clock, and for threatening to walk out if

20  certain managers presented at his store.  Plaintiff admitted this.  CSK warned Plaintiff this

21  behavior was disruptive, unprofessional, and negatively impacted team morale.  (Case No. 11-

22  3119, Docket No. 76-1, p. 8:21-9:8; Order, p. 9:6-23.)

23         Then, in November 2010, CSK terminated Plaintiff after he verbally accosted a customer

24  in a crowded store.  On November 6, 2010, employees reported the altercation.  The customer

25  approached Plaintiff about a tool, and asked if he could test it in placing the BMW emblem on his

---

26  [2]      Plaintiff originally claimed "Failure to Engage in Interactive Process with Disabled

27  Employee" under FEHA (4th claim), "Intentional Infliction of Emotional Distress," (8th claim),
    and defamation (9th claim in his First Amended Complaint).  However, each was dismissed.

28  (Case No. 10-05438, Doc. No. 107, p. 2:14-17.)

Higgs Fletcher &
Mack LLP
Attorneys At Law
San Diego

1171538.2                                6            10-CV-05438 (PJH) & 11-CV-03119 (PJH)
                                                        P&A's on Mtn for Attys' Fees

car.  Employees reported Plaintiff got angry, and said "I can't believe you own a fuckin' BMW and can't afford to buy the tool."  The customer then asked Plaintiff's name.  Plaintiff leaned in closely, pointed to his shirt, and loudly screamed "NORM!"  The customer then threw the tool across the counter, said he would never shop there again, and left.  As he did, Plaintiff yelled to the customer "fuck you and your BMW."  The customer later complained.

Employees also complained to CSK, submitting statements that Plaintiff provoked the customer, leaned in closely to him over the counter, yelled in his face, and was the first to use profanity.  Reports also said this occurred in a crowded store with 10-15 customers (plaintiff said 25-30), customers complained about Plaintiff's "unprofessional behavior," and employees had to apologize for Plaintiff.  CSK investigated, interviewed witnesses, and obtained multiple statements, including two from Plaintiff.  After interviewing Plaintiff, management re-interviewed the employees. Ultimately, Brunell decided Plaintiff acted inappropriately.  Based on this "pretty severe" event, as well as his prior disciplinary record, CSK terminated Plaintiff. (Case No. 11-3119, Docket No. 76-1, p. 9:9-27; Order, p. 10:2-23.)

In June 2011, Plaintiff filed *Yoshimoto II*, asserting 15 claims.  In January 2013, the Court entered summary judgment for CSK on his two California Labor Code claims.[3]  (Order, p. 10:24-28.)  The remaining 13 claims were based on Plaintiff's August 2010 corrective actions and November 2010 termination.  They were: (*1*) Title VII racial discrimination, harassment, hostile work environment and retaliation; (*2*) FEHA national origin discrimination; (*3*) FEHA racial discrimination; (*4*) FEHA disability discrimination; (*5*) FEHA age discrimination; (*6*) ADEA violations; (*7*) FEHA retaliation; (*8*) FEHA harassment; (*9*) FEHA failure to prevent discrimination and harassment; (*10*) employment discrimination (California Constitution); (*11*) retaliation under Cal. Labor Code § 98.6; (*12*) retaliation under Cal. Labor Code § 1102.5; and (*13*) wrongful termination.

---

[3]      Plaintiff originally filed claims under Cal. Labor Code sections 203 and 2699 (PAGA). (RJN, Exh. B.)  However, on January 24, 2013, the Court entered summary judgment on them for Defendants.  (Case No. 11-03119, Docket No. 70, p. 2:11-14.)

**C.      The Court's Order on Summary Judgment**

In March 2013, CSK moved for summary judgment in *Yoshimoto I* and *II* on all remaining claims.  (Case No. 10-5438, Docket No. 113-1; Case No. 11-3119, Docket No. 76-1.)  On December 9, 2013, the Court granted CSK full summary judgment in both cases.  (Docket No. 132 [Case 10-cv-05438]; Docket No. 94 [Case 11-03119].)

**1.      *Yoshimoto I* Order**

The Court found Plaintiff failed to meet his prima facie case on *any* of the six FEHA claims he asserted based on his 2008-2009 discipline, probation, and demotion.  (Order, p. 16:15-18 [national origin discrimination], 19:20-23 [race discrimination], 20:12-20 [age discrimination], 23:11-24:5 [retaliation], 24:7-28:13 [harassment], 28:17-29:3 [failure to prevent].)  On the discrimination claims, the Court found CSK's *repeated* warnings for Plaintiff to change his management style and improve his interpersonal communications with employees precluded him from showing, as he must, that he was performing to CSK's legitimate expectations.  (Order, p. 14:13-16:18, 18:1-3.)  The Court noted Plaintiff *never* disputed "the substance of the complaints against him," and found his claim CSK "suddenly" emphasized his poor management style was "belied by the record," which contained numerous prior warnings and discipline on that topic.  (Order, p. 15:21-16:18, 18:18-19.)  The Court also held that, just as during his employment, Plaintiff tried to improperly minimize these known problems by emphasizing "his strong sales performance," but this did not detract from the undisputed performance problems.  (*Id.* at 16:12-16, 18:21-23.)

Even though Plaintiff did not meet his prima facie burden, the Court continued its analysis, also finding CSK had legitimate, non-discriminatory reasons for its actions.  (Order, p. 18:1-14 ["Plaintiff was warned, on multiple occasions, of the need to improve his dealings with co-workers and subordinates, but chose to disregard those warnings based on the belief that his strong sales performance would outweigh any other issues"].)  The Court also summarily rejected Plaintiff's claim CSK was "wrong" to emphasize management skills over sales performance as a basis for showing pretext, noting this defied long-standing law.  (*Id.* at 18:17-19:14.)

/ / /

HIGGS FLETCHER &
MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

1171538.2                                          8          10-CV-05438 (PJH) & 11-CV-03119 (PJH)
                                                                         P&A's on Mtn for Attys' Fees

On the retaliation claim, the Court held Plaintiff did not meet his prima facie burden because his November 2009 demotion occurred too long (five months) after his relevant administrative charge, especially given his many prior "performance-related warnings," and there was no other evidence suggesting retaliatory motive.  (Order, p. 23:11-24:5.)

Plaintiff's harassment claims (age, race, national origin and disability) also failed as a matter of law.  His age harassment claim facially failed because he alleged only a handful of "isolated comments spread over more than two years," which were not sufficiently severe or pervasive as a matter of law.  (Order, p. 25:11-23.)  The Court then summarily rejected alleged evidence about "others" alleged discrimination because Plaintiff admitted he was unaware of this during his employment.  (*Id.* at 25:9-18.)  As to Plaintiff's putative race and disability harassment claims, the Court found Plaintiff failed to exhaust these claims, (*Id.* at 25:24-26:9 [race], 27:11-28:4 [disability]), and that, even if true, the allegations were not sufficiently severe or pervasive as a matter of law.  (*Id.* at 26:10-27:2 [race harassment], 28:5-13 [disability].)

2.    *Yoshimoto II* Order

In *Yoshimoto II*, as above, the Court found Plaintiff did not even meet his prima facie case as to *any* discrimination (Title VII or FEHA, age, race, national origin, or disability) or retaliation (Title VII or FEHA) claim involving his August 2010 discipline and November 2010 termination.  (Order, p. 30:27-32:24.)  The Court noted Plaintiff's termination incident was egregious in nature, and that he *never* denied the incident.  (*Id.* at 32:8 ["Plaintiff does not dispute CSK's characterization of his actions"], 32:20-21 ["Simply put, yelling expletives at a customer is completely inconsistent with a satisfactory job performance"].)  It thus held he was "prevent[ed] … from establishing a prima facie case of discrimination with regard to his termination" because he was not performing his job satisfactorily.  (*Id.* at 32:17-24.)  Nevertheless, the Court continued its analysis, easily acknowledging CSK's legitimate, nondiscriminatory and nonretaliatory termination reasons.  (*Id.* at 33:12-24.)  It also then noted Plaintiff had failed to present *any* evidence of discrimination (pretext) as to either his August 2010 discipline or November 2010 termination.  (*Id.* at 34:5-7 ["no connection between [Tora Tora Tora] comments (or any other discriminatory behavior) and the two corrective actions issued in August 2010"]; 34:12-25 [no

Higgs Fletcher &
Mack LLP
Attorneys At Law
San Diego

1171538.2                                                9              10-CV-05438 (PJH) & 11-CV-03119 (PJH)
P&A's on Mtn for Attys' Fees

1  connection between comments and termination "nearly two years later," "comments too remote in

2  time," "do not undermine CSK's proffered reason"].)  The Court employed the same analysis for

3  Plaintiff's Title VII race discrimination claim, (Order, 30:16-34:25), Title VII retaliation, (*Id.* at

4  35:18-36:8), FEHA national origin, race and disability discrimination (*Id.* at 36:25-38:13, 39:16-

5  42:6), ADEA age discrimination, (*Id.* at 42:8-17), and FEHA retaliation claim (42:18-24), as well

6  as his remaining related claims.  (*Id.* at 43:2-45:10 [failure to prevent, constitutional

7  discrimination, Labor Code retaliation, wrongful termination].)  The Court also summarily

8  rejected Plaintiff's Title VII and FEHA harassment claims, finding none of the allegations met

9  even the most basic elements of such claims.  (Order, 34:26-35:17, 42:25-43:1.)  In granting CSK

10 summary judgment in *Yoshimoto II*, the Court emphasized the egregiousness of Plaintiff's

11 termination-inducing conduct.  (Order, p. 32:20-21, 41:8-18.)

12 **D.    General standard for Awarding a Prevailing Defendant Fees**

13       To award fees under FEHA and Title VII, the court must determine whether: (1)

14 defendant was the prevailing party, (2) plaintiff's cases were "frivolous, unreasonable, or without

15 foundation," and (3) CSK's attorneys' fees are "reasonable."  (*Rodas v. McCullough*, 2013 WL

16 5400287, *2 (N.D.Cal. Sept. 26, 2013 [Hamilton, J.].)  Each issue is discussed in turn below.

17                                            **III.**

18                          **DEFENDANT IS THE PREVAILING PARTY**

19       Under FEHA and Title VII, the Court may award the "prevailing party" reasonable costs

20 and attorneys' fees.  (Cal. Gov. Code § 12965(b); 42 U.S.C. § 2000e-5(k).)  Prevailing party

21 status accrues to one who has received "at least some relief on the merits of the claim."  (*Hewitt v.*

22 *Helms*, 482 U.S. 755, 760 (1987).)  CSK is a prevailing party here because the Court granted its

23 summary judgment motions in full in both *Yoshimoto I* and *II*, (Docket No. 132 [Case 10-05438];

24 Docket No. 94 [Case 11-03119]), and then entered judgment in its favor, on the merits, in both

25 cases.  (Docket No. 133 [Case 10-05438]; Docket No. 95 [Case 11-03119].)

26

27

28

Higgs Fletcher &
Mack LLP
Attorneys At Law
San Diego

1171538.2                              10                10-CV-05438 (PJH) & 11-CV-03119 (PJH)
                                                        P&A's on Mtn for Attys' Fees

# IV.

## BOTH CASES MEET THE STANDARD FOR AWARDING A PREVAILING DEFENDANT ITS FEES

**A.    Standard on the Motion**

Both FEHA and Title VII authorize an award of reasonable attorney fees and costs to the prevailing party.  (Cal. Gov. Code § 12965(b); 42 U.S.C. § 20000e-5(k).)  This matter is submitted to the sound discretion of the trial court.  (*Villanueva v. City of Colton*, 160 Cal.App.4th 1188, 1200 (2008); *Christianburg Garment Co. v. EEOC* ("*Christianburg*"), 434 U.S. 412, 421 (1978).)  The standard for prevailing defendants seeking fees based on FEHA and Title VII discrimination claims is the same: fees must be awarded if the case was "unreasonable, frivolous, meritless **_or_** vexatious."  (*Christianburg*, *supra*, at 421 [emphasis added]; *Cummings v. Benco Building Serv.*, 11 Cal.App.4th 1383, 1386-1387 (1992) [adopting *Christianburg* standard for FEHA prevailing defendant attorneys' fee requests].)  "Meritless" means a groundless case, or one without legal *or* factual basis.  (*Cummings*, *supra*, at 1387 [citing *Christianburg*].)  Whether a claim is "groundless" is evaluated by assessing the entire complaint, not merely any individual claim. (*Jersey v. John Muir Med. Ctr.*, 97 Cal.App.4th 814, 832 (2002).)  Plaintiff's subjective bad faith plays no role in this analysis.  (*Cummings*, at 1387 [citing *Christianburg*].)  Although the standard for a prevailing defendant to recover fees is higher than for a prevailing plaintiff, Congress did intend to protect defendants from "litigation having no factual or legal basis."  (*Christianburg*, *supra*, at 420.)

**B.    *Yoshimoto II* was Patently Meritless from the Outset**

Defendants are entitled to *all* their fees from *Yoshimoto II* because the case was patently groundless from the start.  At law, a prevailing defendant is entitled to recover its fees where a claim is unreasonable, frivolous, groundless, or vexatious, or from the point where plaintiff continued to litigate a claim after it clearly became such.  (*Christianburg*, *supra*, 434 U.S. at 421-22; *Marbled Murrelet v. Babbitt*, 182 F.3d 1091, 1096 (9th Cir. 1999).)  Although this is a high standard, such an award is appropriate where plaintiff's conduct was "egregious," or where his case was "patently baseless for objective reasons."  (*Cummings*, 11 Cal.App.4th at 1389.)

*Yoshimoto II* was unreasonable, frivolous *and* groundless – though it need only be *one* – from the outset.  From October 2006 to November 2009, CSK warned Plaintiff at least <u>eight</u> times that he needed to change his management style and improve his interpersonal skills with co-workers and subordinates.  He knew this, knew he was not meeting CSK's legitimate performance expectations, but always refused, claiming his sales numbers justified his mis-behavior.  When he did not change, CSK demoted him, warning him non-improvement will likely mean termination  (*Id.* at7:26-8:8.)  Plaintiff then took leave until March 2010.  On his return, he stopped working his assigned shifts, which he *admitted* violated CSK policy.  (Case No. 10-5438, Docket No. 113-10, p. 67, p. 260:12-261:1, 262:15-19; *Id.* at Docket No. 113-14, p. 123:7-21; Notice of Lodgment ("NOL"), Ex. 1, p. 36:3-7.)  Then, in November 2010, as the ranking manager in a crowded store, he angrily told a customer "I can't believe you own a fuckin' BMW and can't afford to buy a tool," and "fuck you and your BMW."  As the Court recognized, this is an *patently* egregious transgression.  (*Id.* at 32:20-21 ["Simply put, yelling expletives at a customer is completely inconsistent with a satisfactory job performance"]; 41:10-18 [conduct is "egregious;" "[g]iven that customer service is sometimes the only thing that distinguishes competitors, the <u>egregiousness</u> <u>of</u> <u>plaintiff's</u> <u>conduct</u> <u>cannot</u> <u>be</u> <u>overstated</u>, particularly given his status as a manager who was supposed to be setting an example for his subordinates"]; NOL, Ex. 1, p. 37:13-15 [**Court:** "I cannot imagine many retailers who *wouldn't* terminate an employee who used the F word when discussing something that a customer asked for"].)

Overall, Plaintiff simply <u>never</u> had, or therefore could not present, a colorable claim, either legally or factually.  Under settled law, when the record conclusively shows a patently nondiscriminatory termination reason supported by abundant, uncontroverted evidence – as here – an employer is entitled to judgment as a matter of law.  (*Guz v. Bechtel Nat'l, Inc.*, 24 Cal.4[th] 317, 362 (2000) [not even a "weak issue of fact" can allow claim to proceed in face of such evidence].)  However, Plaintiff filed this patently groundless case anyways and, not surprisingly, Plaintiff could not even meet his prima facie case – a low standard "designed to eliminate at the outset the most patently meritless claims."  (*Guz*, at 354)  The Court also he lacked any evidence of discriminatory intent.  Both results entitle CSK to its fees.  (*Gonzales v. Metpath, Inc.*, 214

HIGGS FLETCHER &
MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

1171538.2

12

10-CV-05438 (PJH) & 11-CV-03119 (PJH)
P&A's on Mtn for Attys' Fees

Cal.App.3d 422, 426, 428 (1989), *abrogated on other grounds* [plaintiff "did not even establish a prima facie case," no evidence of unlawful discrimination, fee award upheld after summary judgment for employer]; *Guthrey v. State of Cal.*, 63 Cal.App.4th 1108, 1111 (1998) [fee award proper where no prima facie case, no evidence of discriminatory motive].)

Moreover, case law shows this is *exactly* the type of egregious conduct for which a prevailing defendant *must* be awarded their fees.  (*Cummings*, *supra*, 11 Cal.App.4th at 1389 ["patterns developed" in case law show fees properly awarded where "plaintiff's conduct was egregious"].)  For instance, *Moosa v. Dolan Foster Enterprises, Inc.*, 1998 WL 30060 (N.D.Cal. Jan. 5, 1998)) is squarely on point.  There, plaintiff was a "team unit manager" – i.e., district manager – for various Taco Bell restaurants, supervising numerous employees at different stores. (*Id.* at *1.)  In a one-year span, subordinates lodged numerous complaints about his unprofessional, confrontational behavior.  (*Id.* at *2-*3.)  His employer, DFE, therefore transferred him.  (*Ibid.*)  But employees still complained.  Then, in August 1994, a few months after his transfer, plaintiff threatened two subordinates with violence.  DFE fired him after investigating the incidents, which plaintiff admitted.  (*Id.* at *3.)  Plaintiff sued for racial and national origin discrimination, harassment, and wrongful termination (amongst others).  (*Id.* at *1.)  Judge Patel granted DFE summary judgment, and DFE moved to collect their fees.  (*Id.*) The Court granted the motion, noting: (*a*) plaintiff could not meet even his prima facie showing, (*Id.* at *6), (*b*) plaintiff's conduct was egregious (especially given the prior string of issues), and he thus knew DFE had legitimate, non-discriminatory reasons for terminating him from the outset of the case, (*Id.* at *7), and (*c*) plaintiff knew from the outset he legally could not show satisfactory job performance without direct evidence of discriminatory intent, which he completely lacked.  (*Id.*)  This case, on all fours here, entitles CSK to its fees on *Yoshimoto II*. Other cases likewise support this conclusion.  (*Bond v. Pulsar Video Prod*, 50 Cal.App.4th 918, 924 (1996) [fee award upheld after trial; employer "dragged through expense of" litigation needlessly where "no evidence at all that he should have believed he was being discriminated against"]; *Villanueva*, *supra*, 160 Cal.App.4th at 1200-1201 [upholding employer fee award after summary judgment where only evidence showed legitimate reasons for adverse action, no

HIGGS FLETCHER &
MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

1171538.2

13

10-CV-05438 (PJH) & 11-CV-03119 (PJH)
P&A's on Mtn for Attys' Fees

1   discrimination evidence; entitlement to fees "cannot seriously be questioned"].)

2         Moreover, because *Yoshimoto II* was groundless at its inception, CSK is entitled to *all* its

3   fees in defending the case.  Both *before* filing and *during* the case, Plaintiff admitted to the

4   termination incident, as well as the fact CSK could have properly terminated him for it.  (*See e.g.*

5   Order, p. 32:8 ["Plaintiff does not dispute CSK's characterization of his actions"]; NOL, Ex. 1, p.

6   33:14-15, 22 [**Plaintiff's counsel**: "the incident … that they terminated [him] for, it occurred.

7   [Plaintiff] does not deny it occurred … [a]nd that incident happened"]; p. 33:22-34:2 [**Court**:

8   "The question is couldn't [Plaintiff] have been fired for going off on a customer like that?"

9   **Counsel**: "He could have"]; p. 35:4-7 [**Court**: "So [Plaintiff] doesn't deny that he engaged in the

10  conduct towards a customer, does he?"  **Counsel**: "No.  He – he does not deny that, Your

11  Honor"].)  In fact, at his <u>pre</u>-<u>suit</u> EDD hearing, he <u>admitted</u>, under oath, that the termination

12  incident was legitimate grounds for his termination.  (Case No. 10-5438, Docket No. 113-14

13  [NOL Ex. 57], p. 30:4-7 ["**Q:** And you were aware that it would violate company policy to use

14  profanity with respect to a customer, weren't you?  **A:** That's – yeah, that's what it says in the

15  rules"], p. 31:25-33:3 [same].)  Thus, even *before* he filed, Plaintiff knew his discrimination and

16  retaliation claims were "obviously contrary to undisputed fact," making the case "patently

17  baseless for objective reasons." (*Cummings, supra*, 11 Cal.App.4[th] at 1389-1390.)  This entitles

18  CSK to all its fees for *Yoshimoto II*.  (*Id.* at 1390 [fees from point plaintiff continued to litigate

19  after case was obviously groundless]; *See Moss v. Assoc. Press*, 956 F.Supp.891, 895 (C.D.Cal.

20  1996) [fee award from time plaintiff testified legitimate reasons existed for termination]; *Moosa*,

21  *supra*, 1998 WL 30060, *8 [defendant entitled to fees from point plaintiff admitted under oath to

22  egregious termination behavior].)

23  **C.    *Yoshimoto I* Also Meets the Standard for Awarding Defendant Fees**

24         CSK is likewise entitled to collect all its fees in *Yoshimoto* I under the same standard as

25  above.[4]  Plaintiff knew – indeed *admitted* – to the legitimate reasons for his discipline, probation

26  and demotion as they occurred, under oath, before he filed suit.

27  _____

28     [4]    Plaintiff asserted only FEHA claims in *Yoshimoto I*, and Defendant should be awarded its
       fees under Cal. Gov. Code section 12965(b).

HIGGS FLETCHER &
MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

1171538.2                                14                10-CV-05438 (PJH) & 11-CV-03119 (PJH)
                                                          P&A's on Mtn for Attys' Fees

In October 2006, he coerced his subordinate into contributing $10,000 to his personal business, which got CSK sued.  In March 2007, CSK informed Plaintiff he needed to work on his "people skills," making this his top goal for the next year.  When his boss told him he needed to change his management style, he refused, saying his numbers were good.  (Case No. 10-5438, Docket No. 113-10, p. 42, p. 159:22-160:7; *Id.* at Docket No. 113-10, p. 102, p. 68:15-69:7.)  In October 2007, he yelled at subordinates.  When confronted about this, he again admitted it.  CSK disciplined him, noted this "cannot be tolerated," and, if not remedied, he might be fired.  In March 2008, his evaluation *again* noted his deficient interpersonal skills, and made improving them his top goal for the next year.  However, Plaintiff, true to his past and future stance, told CSK "he didn't see it as a problem," and felt he needed no improvement.  (Case No. 10-5438, Docket No. 113-10, p. 45-46, p. 173:23-174:17 ["didn't see it as a problem;" "**Q:** You didn't agree with it then and you don't agree with it now? **A:** No."].)  In June 2008, Plaintiff ran an improper employee contest, cursed out an employee (saying "this is fucking bullshit" several times), and retaliated against the complainants.  He admitted to this conduct, both then, and in deposition.  (Case No. 10-5438, Docket No. 113-10, p. 48-49, p. 182:12-17, 183:4-6, 188:20-189:3 [at depo, admits told HR agent "this is bullshit" or "fuck this shit" several times, got upset]; *Id.* at Docket No. 113-12, p. 2, ¶ 3 [admits to same in corrective action].)  CSK thus, *again* warned him this was not tolerable, it disciplined him, and warned failure to correct this issue "will most likely result in termination of your employment."  It then transferred him.

However, in Plaintiff's new district, employees still complained about his unprofessional behavior.  Plaintiff did not dispute the claims; he just called the complainants "underperformers."  Thus, in March 2009, CSK put Plaintiff on probation for his repeated transgressions, *again* warning failure to improve would mean demotion and possible termination.  Also, for the *third* straight year, Plaintiff's evaluation *again* noted his deficient interpersonal skills, and made improving them his top goal.  When Plaintiff returned from leave, employees *still* complained.  So, in November 2009, CSK finally demoted him, after seven prior warnings.

Despite all this, including undisputed facts showing longstanding, legitimate, non-discriminatory reasons – none of which Plaintiff *ever* disputed – he still filed and pursued

Higgs Fletcher &
Mack LLP
Attorneys At Law
San Diego

1171538.2                                       15        10-CV-05438 (PJH) & 11-CV-03119 (PJH)
                                                          P&A's on Mtn for Attys' Fees

*Yoshimoto I.* Plaintiff knew at the time he filed that his case was contrary to undisputed fact. When he was demoted, he *admitted* to CSK he was being demoted because he failed to improve his interpersonal skills after numerous warnings (but was *still* refusing to change). (Case No. 10-5438, Docket No. 113-14, p. 52, ¶¶ 3-4 ["I have been told to change my management style and it is too strong. I was told to change or else I would be fired" … "[m]y proven track record showed I had been very successful in the past, so why did I need to change what was working for me?"].) He also told CSK, immediately *after* his demotion, that he was not being treated any differently than other district managers. (Case No. 10-5438, Docket No. 113-14, p. 55, ¶ 5 ["[o]ther DM's feel the same as me. When they get accused, they are automatically guilty and treated unfairly"].) Then, at his <u>pre-suit</u> EDD hearing, Plaintiff admitted the same, under oath, as well as the fact that, at the time of his demotion, he knew he was not meeting CSK's stated expectations.[5] (Case No. 10-5438, Docket No. 113-14, p. 116:16-117:21, 118:10-12, 127:8-27 [knew CSK had ongoing concerns about his behavior, profanity].) Then, in deposition, he again admitted CSK did not treat him differently than any other district manager. (Case No. 10-5438, Docket No. 113-10, p. 27, p. 99:15-100:16 [admits "treated the same as other district managers who had received criticism"]; p. 51-52, 197:20-198:5 [same]; p. 55, p. 210:12-25, 211:17-21 [admits does not know if Stahl graded him more harshly than others].) Moreover, at oral argument on summary judgment, Plaintiff's counsel reiterated that CSK could have legitimately terminated Plaintiff for his repeated transgressions. (NOL, Ex. 1, p. 36:8-22 [**Court**: CSK could have terminated Plaintiff for various 2006-2009 issues? **Plaintiff's counsel**: "Certainly"].) Despite Plaintiff's repeated *admissions* that he <u>knew</u> he was not meeting CSK's legitimate performance expectations, he recklessly disregarded the warnings, and *still* sued CSK.

Moreover, in doing so, his main contention utterly defied long-established law. His main claim in *Yoshimoto I* was that CSK was *wrong* to prioritize management style over his "strong

---

[5]     Ironically, although Plaintiff expected his subordinates to improve when told, he apparently felt that principle did not apply to him. (Case No. 10-5438, Docket No. 123, p. 16 [Plaintiff to subordinate: "I have discussed this with you before and there has not been any improvements," discipline will issue, and "if there continues to be no improvement further disciplinary actions will be issued"].)

HIGGS FLETCHER &
MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

1171538.2                    16                10-CV-05438 (PJH) & 11-CV-03119 (PJH)
                                              P&A's on Mtn for Attys' Fees

sales" numbers.  (Order, p. 16:12-15 ["Plaintiff essentially asks the court to disregard all of his document performance issues, and instead argues that his strong sales performance, standing alone, establishes he was performing according to CSK's legitimate expectations"]; p. 18:8-11 ["Plaintiff was warned, on multiple occasions, of the need to improve his dealings with co-workers and subordinates, but chose to disregard those warnings based on the belief that his strong sales performance would outweigh any other issues"]; p. 18:21-23 ["Essentially, plaintiff argues that CSK was wrong to consider his management skills along with his sales performance, and wrong to take any adverse actions based on poor management skills"].)  However, it is, and has been, hornbook law for years that an employer is not liable under FEHA for intentional discrimination by simply being "wrong" in its actions.  (Order, p. 18:21-19:3 [citing *Hersant v. Dept. of Social Serv.*, 57 Cal.App.4th 997, 1005 (1997)].)  Plaintiff knew this, and also knew his unsupported discrimination / retaliation claims not only lacked proof, but were "obviously contrary to undisputed facts" – facts he admitted to then, before filing suit, and admitted to again, during discovery.  (*Cummings*, *supra*, 11 Cal.App.4th at 1389-1390; Order, p. 15:25-16:12 ["[n]otably, plaintiff does not challenge the substance of the complaints against him, but rather argues that CSK 'suddenly' began emphasizing management skills … but plaintiff's argument is belied by the record," which shows numerous prior warnings]; p. 18:18-19 ["Plaintiff does not challenge the substance of any of the above-mentioned disciplinary actions, performance evaluations, or other warnings"].)  This reckless disregard for the undisputed facts and law – all showing the claims were patently groundless long *before* he filed suit – precluded Plaintiff from even meeting his (low) prima facie burden on summary judgment, and mandates CSK be awarded all its fees here.

Overall, Plaintiff claimed *systematic* discrimination and retaliation by CSK in the face of contradictory facts he admitted to, and without any evidence of intentional discrimination whatsoever.  Plaintiff's discipline, probation and demotion involved evidence from 33 employees, which was evaluated over time by nine managers, including six HR professionals.  Plaintiff never presented, discovered, or even *attempted* to discover proof that every single one of these persons, spanning various events and three+ years, all meant to intentionally and unlawfully discriminate /

retaliate against him, and nevertheless waged an objectively groundless case against CSK.

**D.      Conclusion**

Taken together, *all* of Plaintiff's claims were patently groundless from the outset of *Yoshimoto I* and *II*, and CSK is thus entitled to an award of *all* its fees.

## V.

## A FEE AND COSTS AWARD OF $398,145.51 SHOULD BE ENTERED FOR DEFENDANTS

**A.      CSK's Requested Attorneys' Fee Award are Reasonable**

1.      <u>Standard</u>

Fee awards encompass all "reasonable" fees, (Cal. Gov. Code § 12965(b); 42 U.S.C. § 2000e-5(k)), including those spent bringing the motion for attorneys' fees.  (*Moosa*, *supra*, 1998 WL 30060, at *9.)  Under the lodestar method, reasonable fees are those the moving party shows to be the number of hours reasonably spent on the litigation multiplied by a reasonable hourly rate.  (*Hensley v. Eckerhart*, 461 U.S. 424, 433 (1980); *Rodas*, *supra*, 2013 WL 5400287, *2.)  State law governs the required documentary showing for attorneys' fees requests in diversity actions such as this.  (*Winterrowd v. Am. General Annuity Ins. Co.*, 556 F.3d 815, 827 (9th Cir. 2009).)  This showing is met by presenting: (*a*) evidence (documents or oral) of the services actually performed; and (*b*) expert opinion, by the applicant and other lawyers, as to what would be a reasonable fee for such services.  (*Id.*)  Contemporaneous time records are not needed.  (*Id.*)

2.      <u>CSK's Attorneys' Fees</u>

CSK's attorneys, and paralegal fees, are, as of January 24, 2014, $379,591.60 in defending both *Yoshimoto I* and *Yoshimoto II*, as more particularly noted in the declarations of James M. Peterson, lead counsel, and Jason C. Ross, associate.  This represents 248.1 hours by Mr. Peterson at an average rate of $365.48/hour (either $385 or $350/hour), and 982.6 hours by Mr. Ross at $265/hour.  It also accounts for 58.3 hours of paralegal time at $100/hour, as well as approximately 41 hours for the work of three other attorneys.  (Peterson Dec., ¶ 12-14, 16-17; Ross Dec., ¶ 8.)  CSK has been billed this amount, and these fees, throughout the case, and they have been actually incurred.  (Peterson Dec., ¶ 18; *Rodas*, *supra*, 2013 WL 5400287, *3 [fees

1   reasonable because "actually billed to defendant"].)

2   Also, the rates are patently reasonable.  Mr. Peterson charged at an hourly rate of

3   $350/hour and $385/hour.  (Peterson Dec., ¶ 4.)  Mr. Ross charged at an hourly rate of $265/hour.

4   (Ross Dec., ¶ 8.)  Both rates are well below the median hourly rate ($412/hour) for consumer

5   attorneys in California three years ago.  (*Rodas*, 2013 WL 5400287, *3.)  Further, Mr. Peterson's

6   rate is less than the rate for comparable lead trial counsel in a comparable, 20-year old

7   employment case.  (*Bihun v. AT&T Info. Sys., Inc.* 13 Cal.App.4[th] 976, 997-998 (1993)

8   [approving $450/hourly rate for lead employment counsel as "reasonable"]; Peterson Dec., ¶ 3-5.)

9   Further, Mr. Ross's rate is extremely competitive in California for an attorney of his background

10  and experience.  (Ross Dec., ¶ 9.)

11  Further, the services provided were more than reasonable, as more fully detailed in the

12  Peterson declaration.  *Yoshimoto I* has been pending since February 2010, and Plaintiff asserted

13  nine causes of action relating to alleged adverse events reaching back to 1998, and predicated on

14  a huge number of adverse acts and factual allegations.  *Yoshimoto II* was then filed in June 2011,

15  in which Plaintiff asserted 15 additional causes of action based on a number of additional factual

16  allegations.  The case, as this Court knows, raised a huge number of claims, factual events, and

17  issues.  Early in the case, large swathes of written discovery necessarily occurred given the

18  breadth and scope of the factual and legal claims alleged by Plaintiff.  CSK had to obtain

19  Plaintiff's extensive medical records.  Three major depositions occurred, and CSK took five

20  expert depositions as well.  Multiple motions to dismiss were (successfully) filed, and three

21  motions for summary judgment were also filed pertaining to this case.  Moreover, the work on the

22  file fluctuated as would be expected.  After extensive factual discovery occurred, and dispositive

23  motions were briefed and heard, little work was done on the case, as would be expected.  (*Rodas*,

24  *supra*, 2013 WL 5400287, *3 [reasonable because "fees fluctuate with the amount of work one

25  would expect at certain points in the case"].)  CSK even delayed significant expert work in 2014

26  as long as possible to avoid potentially needless expense.  (Peterson Dec., ¶ 6-11.)  The fees

27  generated, representing necessary work on a case of this nature, were reasonably incurred.

28  Additionally, Mr. Ross spent 32.1 hours in meeting and conferring on this motion, as

HIGGS FLETCHER &
MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

1171538.2                                    19                    10-CV-05438 (PJH) & 11-CV-03119 (PJH)
                                                                  P&A's on Mtn for Attys' Fees

1   required by N.D. L.R. 54-5, and drafting it, at $265/hour. (Ross Dec., ¶ 10.) Mr. Ross also

2   anticipates an additional 18 hours in drafting a reply, and preparing for, and arguing the motion,

3   bringing fees on this motion to $13,275.60. (*Id.*) Combined with fees previously incurred, the

4   fee award should be for a total of $379,591.60.

5       3.   Costs Award

6       When the "groundless" standard is met, the Court also has discretion to include expert

7   witness fees as part of a Title VII or FEHA attorneys' fee award. (42 U.S.C. § 2000e-5(k) [court

8   may "allow the prevailing party … a reasonable attorney's fee (including expert fees) as part of

9   the costs"]; Cal. Gov. Code § 12965(b); *Baker v. Mulholland Sec. and Patrol, Inc.*, 204

10   Cal.App.4th 776, 782-83 (2012).) This includes not only fees paid for the prevailing party's *own*

11   expert, but those "expenses related to discovery that [defendant] incurred in deposing [plaintiff's]

12   expert." (*Harris v. Marhoefer*, 24 F.3d 16, 20 (9th Cir. 1994).) Defendants incurred $12,300 in

13   expert fees for its expert psychiatrist. (Peterson Dec., ¶ 15.) Defendants also paid $4,725 in fees

14   to Plaintiff's designated experts to depose them. (*Id.* at ¶ 19.) Defendants also incurred

15   $1,528.91 in photocopying. (*Id.* at ¶ 20.) CSK thus requests the Court award it expert fees

16   totaling $18,553.91.

17                                   **VI.**

18                             **CONCLUSION**

19       Based on the above, CSK respectfully requests the Court enter an order awarding it

20   $379,591.60 in attorneys' fees, $17,025 in expert fees, and $1,528.91 in costs.

21

22   DATED:  January 24, 2014              HIGGS FLETCHER & MACK LLP

23

24                                         By: */s/ Jason C. Ross*
                                              JAMES M. PETERSON, ESQ.
25                                            JASON C. ROSS, ESQ.
                                              Attorneys for Defendants
26                                            CSK AUTO. INC.

27

28

HIGGS FLETCHER &
MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

1171538.2                          20          10-CV-05438 (PJH) & 11-CV-03119 (PJH)
                                               P&A's on Mtn for Attys' Fees